<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW)** <br> **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *The State of Montana, ex. rel. Austin Knudsen, Attorney General v. Eli Lilly and Company, et al.* | |
| Case No. 2:23-cv-04214 | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss (the "Motion") filed by Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc. (together, "Express Scripts"); CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx, LLC, Caremark PCS Health, LLC, and Caremark, LLC (together, "CVS Caremark"); and UnitedHealth Group Inc., OptumRx Inc., and OptumInsight, Inc.'s (together, "OptumRx") (collectively, "PBM Defendants"),[1] to dismiss Plaintiff State of Montana's (the "State") First Amended Complaint

---

[1] Certain PBM Defendants (Evernorth Health, Inc. ("Evernorth"); CVS Health Corporation ("CVS Health"); and UnitedHealth Group Inc. and OptumInsight, Inc. (together, "UHG Defendants")) filed motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (ECF Nos. 190-13–18.) Pursuant to ECF Nos. 714–19, the Court granted the State's request for jurisdictional discovery and denied Evernorth, CVS Health, and UHG Defendants' motions to dismiss with leave to refile at the conclusions of jurisdictional discovery. Because jurisdictional discovery is ongoing, and it is not yet known whether Evernorth, CVS Health, and UHG Defendants are subject to jurisdiction in Montana, the Court cannot yet address PBM Defendants' Rule 12(b)(6) Motion as to these defendants. *See Signal Peak Energy, LLC v. Generon IGS, Inc.*, Civ. A. No. 17-66, 2018 WL 5309820, at *7 (D. Mont. Aug. 3, 2018) (declining

(Dkt. No. 2:23-cv-04214, ECF No. 40)[2] pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 190-11, 190-12.)[3] The State filed an Opposition to PBM Defendants' Motion to Dismiss (ECF No. 190-23), and PBM Defendants filed their Reply (ECF No. 190-28). The parties additionally filed supplemental briefings. (ECF Nos. 190-52, 190-54.) Having reviewed and

---

to address defendant's Rule 12(b)(6) motion to "[i]n light of its determination that there is no basis to assert personal jurisdiction over [plaintiff]" pursuant to Rule 12(b)(2)); *cf. Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138–39 (9th Cir. 2004) (recognizing "the effect of enforcing a forum selection clause is similar to that of granting a Fed. R. Civ. P. 12(b)(1) (subject-matter jurisdiction) or Fed. R. Civ. P. 12(b)(2) (personal jurisdiction) motion: It 'foreclose[s] suit in the jurisdiction of plaintiff's choice'" (alteration in original) (quoting *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997)). Accordingly, the 12(b)(6) motions to dismiss filed by PBM Defendants Evernorth, CVS Health, or UHG Defendants are denied with leave to refile after jurisdictional discovery and the Court's determination regarding personal jurisdiction. Should the Court ultimately find personal jurisdiction exists over these defendants, they should be guided by this Opinion in the event they chose to refile their Rule 12(b)(6) motions.

[2] Pursuant to Case Management Order #7—Order Governing Motions to Dismiss in the State Attorney General Track ("State AG Track") (ECF No. 141), the State AG Track cases were directed to refile all Fed. R. Civ. P. 12 motions and related exhibits, responses, and replies in the following State AG Track cases: *Illinois ex rel. Raoul v. Eli Lilly & Co. et al.*, No. 2:23-cv-04242 (the "Illinois Action"), and *Montana ex rel. Knudsen v. Eli Lilly & Co. et al.*, No. 2:23-cv-04214 (the "Montana Action"). Consequently, in addition to this Motion, the following motions were filed in connection with the Montana Action: (1) Evernorth Health, Inc. (ECF Nos. 190-13–14), CVS Health Corporation (ECF Nos. 190-15–16), and UnitedHealth Group Incorporated and OptumInsight, Inc.'s (ECF Nos. 190-17–18) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and (2) Manufacturer Defendants' (ECF Nos. 190-1–10) motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The following motions are pending in the Illinois Action: motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by Evernorth Health, Inc. (ECF No. 190-31), UnitedHealth Group Incorporated and OptumInsight, Inc. (ECF No. 190-35), and CVS Health Corporation (ECF No. 190-33), and motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) by Manufacturer Defendants (ECF No. 190-37) and PBM Defendants (ECF No. 190-39). This Opinion only resolves PBM Defendants' Motion to Dismiss pursuant to Rule 12(b)(2). (ECF Nos. 190-11–12.) The other motions filed pursuant to Case Management Order #7 will be addressed separately.

[3] At the direction of the Court, pursuant to Case Management Order #7, the motion and briefs were refiled on the master docket at ECF Nos. 190-11–12, 190-28, 190-52. *See supra* n.1. The Court will use the citations on the master docket unless otherwise indicated.

considered the submissions filed in connection with the Motion, and for the reasons set forth below and for good cause having been shown, PBM Defendants' Motion to Dismiss is **DENIED**.

## I.    BACKGROUND

### A.  Factual History[4]

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the First Amended Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987).[5] "In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, a court may similarly consider 'uncontroverted allegations in the complaint.'" *Lindstrom v. Polaris Inc.*, Civ. A. No. 23-00137, 2024 WL 4237732, at *1 (D. Mont. Aug. 9, 2024) (quoting *Nationwide Agribusiness Ins. Co. v. Buhler Barth GmbH*, Civ. A. No. 15-00582, 2015 WL 6689572, at *3 (E.D. Cal. Oct. 30, 2015)).

This action arises out of the State's challenge to PBM Defendants' allegedly unfair and unconscionable pricing scheme for their insulin medications. (*See generally* First Am. Compl. (Dkt. No. 2:23-cv-04214, ECF No. 40).) The sole plaintiff in this action is the State, brought in its name on relation of the Honorable Austin Knudsen, Attorney General of the State of Montana,

---

[4] The Court assumes the parties' familiarity with the factual and procedural history of this matter and therefore only includes the facts and procedural history necessary to decide this Motion.

[5] Because the parties originally removed the case to the District of Montana, and merely refiled their Motion to Dismiss papers on the master docket (*see* ECF No. 141), the parties use Ninth Circuit law in their arguments. Accordingly, the Court analyzes the parties' arguments pursuant to Ninth Circuit law. *See In re Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020))).

pursuant to the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-101, *et seq.* ("MCPA").

PBM Defendants are pharmacy benefit managers ("PBMs"), or third-party administrators that negotiate drug costs and payments between health insurance providers and drug manufacturers.[6] (*Id*. ¶¶ 296–97.) Drug manufacturers set the list price for their prescription drugs, including insulin, which is known as the Wholesale Acquisition Cost ("WAC"). (*Id*. ¶¶ 285–87.) WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). The WAC serves as the reference point from which PBMs and drug manufacturers negotiate rebates. (*Id*. ¶¶ 295–303.) The WAC differs from, but is related to, the Average Wholesale Price ("AWP"), which refers to the "average price that wholesalers charge[] to providers like doctors and pharmacies."[7] *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass. 2008). Pharmaceutical manufacturers self-report the WAC to publishing compendiums such as First Databank, Redbook, and others. (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 287.)

Branded prescription drugs in the United States move through a complex distribution chain where pharmaceutical manufacturers typically sell their products to wholesalers at a negotiated price. (*Id*. ¶ 286.) Wholesalers then supply the medications to various providers such as

---

[6] More specifically, PBM Defendants "develop drug formularies, process claims, create a network of retail pharmacies, [and] set [drug] prices in coordination with [m]anufacturers[.]" (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 296.)

[7] "Typically, AWP was a twenty percent markup over WAC." *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 87. "[M]ost manufacturers continued to report AWPs consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were not actually charging these prices to providers and thus that the AWP relied on by Medicare and the [third-party payors] was not a true average price charged by wholesalers." *Id.*

pharmacies, hospitals, and clinics, who then distribute the pharmaceuticals to patients with prescriptions. (*Id.* ¶¶ 283–86.) Uninsured consumers ultimately pay the full price for medication, whereas insured consumers pay for a portion of a drug's price through out-of-pocket costs such as deductibles, copayments, or coinsurance. (*Id.* ¶¶ 290–91.) Upstream payments to the manufacturers include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, and indirect purchase fees. (*Id.* ¶ 20 n.3.)

The industry is unique because the way patients pay for prescription drugs vastly differs from the way wholesalers, PBMs, and health insurers pay for those same products. (*Id.* ¶ 285.) The prices for the products in the distribution chain differ for each participating entity—"different actors pay different prices set by different entities for the same drugs." (*Id.*) Manufacturers do not sell medications directly to the consumers and therefore do not set the consumer price for any particular medication; however, they do set the list price (WAC), and consumers usually pay for prescription drugs based on the manufacturer's list price. (*Id.* ¶ 286.)

Health insurers cover all or a portion of their insured customers' medications costs, submit payments to pharmacies on behalf of their members, and receive a reimbursement amount depending on whether and where the medication falls on their PBMs' formularies—the ranked list of approved drugs an insurance plan will cover. (*Id.* ¶ 7.) When insured patients purchase a prescription medication from a pharmacy, both the patient and their insurer pay a portion of the purchase price based on the price negotiated by the PBMs. (*Id.* ¶ 300–04.) Manufacturers understand that the PBMs' formularies drive drug utilization: "if Manufacturers want their drugs to be prescribed and paid for, they must obtain preferrable formulary position on the PBM Defendants' formularies." (*Id.* ¶ 10.) Drug manufacturers may offer rebates to an insurer's PBM

to gain formulary access for their prescription drugs. (*Id.* ¶¶ 20 n.3, 22, 345.) PBMs determine whether to pass along rebates to the health insurer, who in turn decides whether to share these cost-saving measures with consumers. (*Id.* ¶¶ 24–26.)

Here, the State alleges certain manufacturer defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin analog products so they could offer rebates as a "secret Manufacturer Payment[]"[8] to PBM Defendants in exchange for preferred formulary placement, which the State contends caused it and its constituents to overpay for insulin products. (*Id.* ¶¶ 380–402.) The State maintains these manufacturers ("Manufacturer Defendants") artificially inflated the list prices for their insulin products to compete for preferred positions on the PBMs' drug formularies by offering increased rebates to PBMs. (*Id.* ¶¶ 403–08.) The State further alleges that PBMs use their own mail-order and retail pharmacies to get customers to pay these artificially inflated prices for insulin products, resulting in higher profits for PBMs. (*Id.* ¶¶ 409–20.) The State asserts that "Montana diabetics and payors[9], including the State, relied on the artificially inflated list prices by purchasing diabetic medications at such prices." (*Id.* ¶ 422.) The State attributes this pricing scheme to Manufacturer Defendants' "list prices for the at-issue drugs [becoming] detached completely from

---

[8] The State defines the term "Manufacturer Payments" as "all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 20 n.3.) "Manufacturer Payments include rebates, administrative fees, inflating fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates, and any other form of consideration exchanged." (*Id.*)

[9] The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

actual prices," resulting in the "list prices bec[oming] increasingly misrepresentative to the point of becoming unlawful." (*Id*. ¶ 425.)

According to the State, Manufacturer Defendants allegedly engaged in an unfair and unconscionable scheme of competing for formulary access of the largest PBMs[10] by unjustifiably raising the list prices for the insulin analog products so they could offer the middlemen-PBMs bloated rebates—so-called "spreads" between list prices and net prices. (*Id*. ¶¶ 405–07.) "Net Prices" refers to the prices PBM Defendants negotiate and pay for Manufacturer Defendants' products after subtracting from the list prices the rebate amounts Manufacturer Defendants issued to them in order to gain formulary placement. (*Id*. ¶¶ 344, 349.) Net prices may fluctuate as they necessarily depend on PBM Defendants' negotiations with a particular manufacturer. (*Id*. ¶ 303.) The State contends Montana diabetics and payors, including the State, suffered monetary losses from overpaying for their insulin products because PBM Defendants' formularies are at the center of the allegedly unfair and unconscionable insulin pricing scheme. (*Id*. ¶¶ 339, 344.)

The State claims PBM rebates are part of an industry scheme to inflate the price of insulin products, whereby PBM Defendants use their leverage to set formularies and increase profits. (*Id*. ¶¶ 316, 336, 536.) PBM Defendants allegedly: (1) negotiate prices payors pay for prescription drugs, (2) separately negotiate a different (and often lower) price for in-network pharmacies, (3) set the amount in fees the pharmacy pays back to the PBM, (4) set the price paid for each drug sold through mail-order pharmacies, and (5) negotiate the amount manufacturers pay back to the PBMs. (*Id*. ¶ 303.) If a drug is excluded from the formularies, consumers may be required to pay a larger share of the cost, or even the full cost; accordingly, using formularies gives PBM

---

[10] The State asserts "PBM Defendants have taken over the market—controlling more than 80% of the market and managing pharmacy benefits for more than 270 million Americans." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 313.)

Defendants wide latitude to extract rebates from manufacturers. (*Id.* ¶¶ 314, 383–85.) The State argues manufacturers offer PBM Defendants higher spreads in exchange for preferred positions on their drug formularies, rather than lower their list prices for their prescription drugs. (*Id.* ¶¶ 403–05.) The State contends "[t]hese relationships allow PBM[ Defendants] to exert tremendous influence over what drugs are available throughout Montana and at what prices." (*Id.* ¶ 302.) Manufacturer Defendants, "working in coordination with the PBM[ Defendants]," "artificially inflated their list prices for the at-issue drugs exponentially, while largely maintaining their net prices by paying larger and larger amounts of Manufacturer Payments back to the PBM[ Defendants]," resulting in the State and diabetic Montana residents being "overcharged millions of dollars a year," which "directly and proximately caused injuries to consumers in the State of Montana." (*Id.* ¶¶ 20, 28–29, 344.)

### B. Procedural History

On September 29, 2022, the State, through Attorney General Austin Knudsen, filed a Complaint in the Montana First Judicial District Court, Lewis and Clark County. (Compl., Dkt. No. 2:23-cv-04214, ECF No. 12.) The matter was removed to the United States District Court for the District of Montana, Helena Division, on November 14, 2022. (Notice of Removal, Dkt. No. 2:23-cv-04214, ECF No. 1.) A Supplemental Notice of Removal was filed on November 15, 2022. (Suppl. Notice of Removal, Dkt. No. 2:23-cv-04214, ECF No. 2.) The State filed its First Amended Complaint on January 9, 2023. (First Am. Compl., Dkt. No. 2:23-cv-04214, ECF No. 40.) The First Amended Complaint brings claims against PBM Defendants for violation of the MCPA, Mont. Code Ann. § 30-14-101, *et seq.* (Count I), unjust enrichment (Count II), and civil conspiracy (Count III). (*See generally* Dkt. No. 2:23-cv-04214, ECF No. 40.)

On February 23, 2023, PBM Defendants filed their joint Motion to Dismiss the State's First Amended Complaint. (Dkt. No. 2:23-cv-04214, ECF Nos. 96, 97.) The State filed its Opposition on March 31, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 113.) PBM Defendants filed their Reply in support of their Motion on April 28, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 132.) The court heard oral argument on the Motion on May 15, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 150.)

On May 9, 2023, prior to the District of Montana hearing oral argument on the pending Motion to Dismiss, the State, along with movants the States of Arkansas, Illinois, Kansas, and Mississippi, filed notice of their motion for transfer of actions before the Judicial Panel on Multidistrict Litigation ("JPML") pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings. (Dkt. No. 2:23-cv-04214, ECF No. 136.) On August 7, 2023, the JPML issued a Transfer Order, transferring this matter to this Court in the District of New Jersey. (Dkt. No. 2:23-cv-04214, ECF No. 160.) Pursuant to Case Management Order No. 7 (ECF No. 141), the parties re-filed their respective briefings on May 31, 2024 (ECF Nos. 190-11, 190-12, 190-23, 190-28, 190-52, 190-54).

## II.  LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs a motion to dismiss for failure to state a claim upon which relief can be granted. "A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (citing *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)). The Court's standard of review is informed by Federal Rule of Civil Procedure

8(a)(2), which requires the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plausibility determination is context-specific and requires the Court to draw on judicial experience and common sense when evaluating a complaint. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). "[I]n practice, a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562 (second alteration in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

A court considering a Rule 12(b)(6) motion must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *Wyler Summit P'Ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1988). But "'bare assertions . . . amount[ing] to nothing more than a "formulaic recitation of the elements"' . . . for the purposes of ruling on a motion to dismiss, are not entitled to an assumption of truth." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (first two alterations in original) (quoting *Twombly*, 550 U.S. at 555). Such assertions "do nothing more than state a legal conclusion—even if that conclusion is cast in the form of a factual allegations." *Id.*

### B. Federal Rule of Civil Procedure 9(b)

Claims sounding in fraud or mistake are subject to the heightened pleading standard in Federal Rule of Civil Procedure 9(b). When fraud is alleged, Rule 9(b) requires the party state "with particularity the circumstances constituting the fraud." Rule 9(b) "demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). Application of Rule 9(b) is not dependent on whether fraud is an essential element of the claim asserted, rather, if the claim is "grounded in fraud" or "sound[s] in fraud," the particularity requirement of Rule 9(b) must be met. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).

To satisfy the requirements of Rule 9(b), the plaintiff must state the "who, what, when, where, and how of the misconduct charged." *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228 (9th Cir. 2019); *Vess*, 317 F.3d at 1106. "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106. The particularity requirement is governed by federal law, but a federal court "will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action . . . ." *Id*. at 1103.

### III. DECISION

### A. Timeliness

PBM Defendants argue the State's claims should be dismissed as barred by the applicable statute of limitations. (ECF No. 190-12 at 6–9; ECF No. 190-28 at 2–6.) The parties agree that the Montana statutes of limitation applicable to its claims for unfair or deceptive trade practices and

unjust enrichment are two and three years, respectively. (ECF No. 190-12 at 7; ECF No. 190-23 at 15.) *See also* Mont. Code Ann. § 27-2-211(1)(c)[11]; Mont. Code Ann. § 27-2-202(3).[12] The State filed its original complaint on September 22, 2022; however, PBM Defendants contend the State's claims accrued at least five years prior to filing suit. (ECF No. 190-12 at 8; ECF No. 190-28 at 3– 4.) The State maintains that its claims are saved by several tolling doctrines: the discovery rule, the continuing tort doctrine, and fraudulent concealment. (ECF No. 190-23 at 15–17.) The State further asserts, regardless of the tolling doctrines, the statute of limitations period has not expired for acts that occurred within the statutory period of limitation. (*Id*. at 17–19.)

The State contends its claims are tolled by the discovery rule, which tolls the statute of limitations on a cause of action "when the facts constituting a claim are concealed by their nature, or when 'after causing the injury, a defendant has taken an action that prevents an injured party from discovering the injury or its cause.'" (*Id*. at 15–16 (quoting *Anderson v. Boyne USA, Inc.*, Civ. A. No. 21-00095, 2023 WL 2161413, at *3 (D. Mont. Feb. 22, 2023)).) PBM Defendants maintain the State's "delay" in bringing suit "undermines any claim of diligence or conclusory allegations that estoppel or fraudulent concealment might excuse its tardiness." (ECF No. 190-12 at 8–9.) Moreover, PBM Defendants argue that with due diligence, "the State should have been aware of the alleged scheme by at least February 2017." (*Id*. at 9.)

---

[11] Although the MCPA has no statute of limitations of its own, actions to enforce a statutory liability other than a penalty or forfeiture or statutory debt created by the payment of public assistance must be brought within two years. Mont. Code Ann. § 27-2-211(1)(c); *see also Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435, 440–41 (Mont. 2003) (finding that "as a liability created by statute that is neither a penalty nor a statutory debt, claims brought under [the MCPA] . . . are subject to the two-year time limitation set forth" in Section 211).

[12] In the alternative, the State's MCPA claim is governed by Section 203, which applies to all "action[s] for relief on the ground of fraud or mistake" and requires actions be filed within two years of the "discovery by the aggrieved party of the facts constituting the fraud or mistake." Mont. Code Ann. § 27-2-203.

Here, as determined in ECF Nos. 706–07, the date of constructive notice for all plaintiffs in this Insulin multi-district litigation (Dkt. No. 2:23-md-3080) has been determined to be January 14, 2021—the date the Senate Finance Committee released the results and findings of its bipartisan investigation into the rising price of insulin. As this matter was originally filed on September 29, 2022 (Dkt. No. 2:23-cv-04214, ECF No. 12), the five-year limitations period for the State's unjust enrichment claim has not yet run.

Therefore, PBM Defendants' Motion to Dismiss the State's claims as time barred is **DENIED**.

### B.  The State's Pleading Satisfies Rule 9(b)

PBM Defendants contend the First Amended Complaint fails to satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b). (ECF No. 190-12 at 10–13.) PBM Defendants complain that Plaintiff lumps defendants together generally as either "Defendants," "PBMs" or "PBM Defendants." (*Id*. at 11.) PBM Defendants assert that "[p]laintiffs alleging a fraudulent conspiracy must offer detailed and particularized allegations regarding each defendant's role in the fraud." (*Id*.) The State disputes PBM Defendants' arguments for two reasons: (1) Rule 9(b) does not apply to its claims, and (2) the State has not engaged in improper group pleading.

The Court disagrees with the State's assertion that Rule 9(b) does not apply to MCPA claims. *See PNC Bank, Nat'l Ass'n v. Wilson*, Civ. A. No. 14-00080, 2015 WL 3887602, at *7 (D. Mont. June 23, 2015) (applying Rule 9(b) standard to defendant's counterclaim alleging violations of the MCPA); *see also Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 665–68 (9th Cir. 2019) (analyzing plaintiff's claims under state law for fraudulent inducement, conservative fraud, negligent misrepresentation, unjust enrichment, and unfair trade practices under the MCPA under the Rule 9(b) standard); *Keegan v. Am. Honda Motor Co., Inc.*, 838 F. Supp. 2d 929, 957–58 (C.D.

Cal. 2012) (concluding Rule 9(b) applies to a claim under the MCPA that is predicated upon alleged fraudulent conduct). Accordingly, the Court applies Rule 9(b).

The State's allegations sufficiently satisfy Rule 9(b)'s heightened pleading standard. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *see also In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1081 (N.D. Cal. 2021) ("The purpose of Rule 9(b) is to require that a plaintiff's allegations be 'specific enough to give defendants notice of the particular misconduct which is alleged . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" (alteration in original) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007))). To satisfy the specificity requirement of Rule 9(b), "the pleadings must state what the misrepresentation was, what was purchased, when the conduct complained of occurred, by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss." *Smajlaj v. Campbell Soup Co*., 782 F. Supp. 2d 84, 104 (D.N.J. 2011) (quoting *Zebersky v. Bed Bath & Beyond, Inc.*, Civ. A. No. 06-01735, 2006 WL 3454993, at *4 (D.N.J. Nov. 29, 2006)).

Here, the First Amended Complaint alleges PBM Defendants, defined as Defendants CVS Caremark, Express Scripts, and OptumRx, profit off the inflated list prices generated by the alleged Insulin Pricing Scheme by:

> (1)     retaining a significant—yet undisclosed—percentage of the Manufacturer Payments, either directly or through wholly-owned rebate aggregators,
>
> (2)     using the inflated list prices produced by the Insulin Pricing Scheme to generate profits from pharmacies in their networks, and

>(3)    relying on those same inflated list prices to drive up the
>PBMs' profits through their own pharmacies.

(Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 6, 24.) The First Amended Complaint further asserts that

PBM Defendants establish standard formulary offerings, which they understand drive drug

utilization, and then "grant [Manufacturer Defendants] preferred status on their standard

formularies based upon the largest Manufacturer Payment and the highest inflated list price." (*Id*.

¶¶ 7, 8, 22.) Plaintiff's pleading sufficiently identifies the "at-issue drugs" as Humulin N, Humulin

R, Humalog, Trulicity, Basaglar, Lantus, Toujeo, Apidra, Soliqua, Novolin R, Novolin N,

Novolog, Levemir, Tresiba, Victoza, and Ozempic. (*Id*. ¶ 6 n.1.) Moreover, the First Amended

Complaint alleges the State purchased the at-issue drugs from 2003 through the present (*id*. ¶¶ 38,

264–66, 467–71), and PBM Defendants' misrepresentations damaged the State by affecting the

health of diabetics and causing increases in the price of healthcare (*id*. ¶¶ 472–77, 513–14). *See In

re Insulin Pricing Litig.*, Civ. A. No. 17-00699, 2019 WL 643709, at *14 (D.N.J. Feb. 15, 2019)

(finding plaintiffs' consumer fraud claims survived Rule 9(b)'s heightened pleading standard

where the complaint alleged misrepresentation in that defendants warranted the artificially inflated

and publicly reported benchmark prices of the at-issue drugs were the reasonable approximations

of true cost).

As such, PBM Defendants' Motion to dismiss the State's allegations under the MCPA as

insufficient under the heightened pleading standard under Federal Rule of Civil Procedure 9(b) is

**DENIED**.

### C.  The State's MCPA Claim

PBM Defendants allege the State's MCPA claims fail because the Montana State

Legislature has recognized PBM-negotiated rebates as a "standard industry practice." (ECF No.

190-12 at 13 (citing Mont. Code Ann. § 33-2-2404(7)(a)).) PBM Defendants further argue the

State's allegations are insufficient for three additional reasons: (1) "the alleged statements by the PBMs are, themselves, non-actionable"; (2) the State does not sufficiently alleged PBM Defendants engaged in unfair practices; and (3) PBM Defendants' at-issue statements were not made in the course of any trade or commerce." (*Id*.) The Court addresses each in turn.

### 1.     Alleged Statements by PBMs

PBM Defendants claim that the State fails to identify a single actionable or misleading statement by any PBM Defendant. (ECF No. 190-12 at 13–18.) PBM Defendants assert: (1) statements that a defendant will lower costs is mere puffery, which is not considering misleading; (2) "allegations regarding general promises of 'transparency' are non-actionable statements of opinion; and (3) any alleged false statements made during congressional testimony is protected under the *Noerr-Pennington* doctrine." (*Id*.) In response, the State points to specific statements it asserts are more than mere "puffery" that are actionable under the MCPA. (*See* ECF No. 190-23 at 24–25.) The State further argues it is premature for a court to consider the *Noerr-Pennington* doctrine at the pleading stage. (*Id*. at 27–28.)

Courts distinguish misrepresentation from "puffing." "'Puffing' concerns expressions of opinion, as opposed to knowingly false statements of fact[.]" *Oregon Pub. Employees Retirement Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). "Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Id*. (citing *SEC v. Todd*, 642 F.3d 1207, 1216–17 (9th Cir. 2011) (finding defendant's accounting calculation of the financial impact of a transaction was objective and a material misrepresentation)).

The statements cited by the State are misleading statements that are actionable under the MCPA. (*See, e.g.,* ECF No. 190-23 at 24–25 (alterations in original).) Specifically, the State

included three actionable statements: (1) "[Express Scripts] saved our clients more than $3 billion through Express Scripts National Preferred Formulary"; (2) "CVS Caremark represented that it was focused on diabetes to help us add value for our PBM clients . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures" (internal quotation mark omitted); and (3) "OptumRx represented to the State that . . . its formulary management services target diabetes 'to effectively drive drug therapy changes . . . [and] control total healthcare costs' and drive 'safety, efficacy, and relative value.'" (*Id*.) These statements make specific representations that are neither general nor subjective. *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) (holding statements that are "quantifiable" or refer to "specific or absolute characteristics" are actionable misrepresentations, while "general, subjective" claims are puffery).

Accordingly, the Court finds that these statements are sufficiently specific to constitute an actionable misrepresentation under the MCPA.[13] *See Mississippi ex rel. Fitch v. Eli Lilly & Co.*, Civ. A. No. 21-00674, 2022 WL 18401603, at *3–4 (S.D. Miss. Aug. 29, 2022) (finding the PBM defendants' "specific statements about insulin pricing that the State particularly alleges are false" were sufficiently pled at the motion to dismiss stage); *see also Direct Purchaser Insulin Pricing Litig.*, 2021 WL 2886216, at *14–15 (alterations in original) (finding misleading statements actionable where plaintiffs "allege the PBM Defendants 'told clients, potential clients, and investors that they secured lower [drug] prices' while the 'Manufacturer Defendants inflated list prices and funded the bribes and kickbacks in exchange for favorable [formulary] placement'");

---

[13] To the extent PBM Defendants argue that statements made during congressional testimony are protected under the *Noerr-Pennington* doctrine, the Court declines to dismiss the State's claims at this point in time, as the State's First Amended Complaint suggests that not all referenced misrepresentations were made during the course of congressional testimony. (*See* Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 351, 441–43, 449.)

*In re EpiPen Direct Purchaser Litig.*, Civ. A. No. 20-0827, 2021 WL 147166, at *19 (D. Minn. Jan. 15, 2021) (finding plaintiffs satisfied Rule 9(b)'s heightened pleading standard where "[t]hey allege[d] that the PBM Defendants represented to their clients that their interests would be aligned and that rebates would lower drug costs, and they identify specific marketing statements to that effect").

### 2. PBMs Unfair Acts or Practices

PBM Defendants contend the State does not allege any "'unfair practices' distinct from 'deceptive' practices," and therefore, the State's claims fail. (ECF No. 190-12 at 18–19.) The State counters that it has sufficiently alleged all requirements of the unfairness standard, therefore its claims survive. (ECF No. 190-23 at 11–15.)

"An unfair act or practice is 'one which offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Doherty v. Fed. Nat'l Mortg. Ass'n*, 319 P.3d 1279, 1283 (Mont. 2014) (quoting *Rohrer v. Knudson*, 203 P.3d 759, 764 (Mont. 2009)). The Montana legislature enacted these provisions "to protect the public from unfair or deceptive practices." *Tripp v. Jeld-Wen, Inc.*, 112 P.3d 1018, 1026 (Mont. 2005); *see also* Mont. Code Ann. § 30-14-201. The Montana Supreme Court has stated that statutes like the MCPA have been interpreted as "broad in scope and flexible in application so as to respond to human inventiveness." *Baird v. Norwest Bank*, 843 P.2d 327, 333 (Mont. 1992) (citing *In re Smith*, 866 F.2d 576 (3d Cir. 1989)). Accordingly, the MCPA "should be liberally construed with a view to effect its object and to promote justice." *Id*.

The MCPA reaches "more broadly" than mere deception and includes "practice[s] contrary to 'established public policy.'" *Anderson v. ReconTrust Co., N.A.*, 407 P.3d 692, 700 (Mont. 2017) (citation omitted). While the MCPA does not further define unfair or deceptive acts, Montana

courts "give due consideration and weight to interpretations of the [Federal Trade Commission ("FTC")] and federal courts regarding § 5(a)(1) of the FTC Act,[14] as required by [Mont. Code. Ann.] § 30-14-104(1)." *Rohrer*, 203 P.3d at 764. "Examples of unlawful acts or practices in the conduct of trade or commerce are listed in a Montana regulation, which also references interpretations of the FTC and federal courts regarding § 5(a)(1) of the FTC Act," referring to Mont. Admin. R. 23.19.101. *Id.* at 763.

PBM Defendants argue the State "does not (and cannot) point to any *established* constitutional, statutory, or regulatory provision to support a claim of an 'unfair practice.'" (ECF No. 190-12 at 19.) However, the Court finds that PBM Defendants' alleged actions fall squarely within the scope of unlawful acts or practices as listed in Montana regulations. Montana's regulations make clear that a person is engaged in an unfair and, therefore, unlawful act in the following scenarios:

> A person engages in unfair or deceptive and therefore unlawful acts or practices when, in the conduct of any trade or commerce, he:
>
> . . .
>
> (e) makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of merchandise, or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;
>
> . . .
>
> (k) makes false and misleading statements of fact concerning the price of merchandise or the reason for existence of, or amounts of a price reduction;
>
> (l) states that a transaction involves rights, remedies or obligations that it does not involve; or
>
> . . .

---

[14] FTC Act is the Federal Trade Commission Act. 15 U.S.C. §§ 41–58.

(p) employs deceptive pricing practices.

Mont. Admin. R. 23.19.101(1). The State's First Amended Complaint alleges that PBM Defendants' conduct constituted an unfair trade practice because "PBM Defendants completely dominate the pharmacy benefit services market and control nearly every Manufacturer Payment paid in this market." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 517.) The State further alleges:

> [T]he entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers' misrepresentations related to the reason behind the price, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is unfair and deceptive.

(*Id*. ¶ 464.) Moreover, and specifically as to the MCPA, the State alleges that PBM Defendants engaged in deceptive and unfair practices by (1) "[k]nowingly making false representations as to the characteristics and benefits of goods and services,"[15] (2) "ma[king] false representations that their formularies and the Manufacturer Payments they receive have the benefit and characteristic of lowering the price of the at-issue drugs and promoting the health of diabetics," (3) "[c]oncealing, suppressing, and omitting material facts with the intent that others rely on the concealment,

---

[15] The State alleges PBM Defendants did so by "ensur[ing] that the Manufacturers' list prices harmed diabetics and the State by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment," "[d]espite knowing these prices were false and artificially inflated," and "[b]y granting the at-issue diabetes medications with the highest list prices preferred formulary positions," thereby "ensur[ing] that prices generated by the Insulin Pricing Scheme would harm Montana diabetics and the State." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 513.)

suppression, and omission while selling any goods or services,"[16] and (4) "[r]epresenting that a specific price advantage exist[ed], when it did not."[17] (*Id*. ¶ 513.)

Though the unlawful practices and acts listed in Montana's Regulations are non-exhaustive, *see* Mont. Admin. R. 23.19.101(2), this Court finds PBM Defendants' alleged actions fall squarely under the enumerated list recognized as an unlawfully deceptive or unfair act or practice.

### 3.    Alleged PBM Conduct

PBM Defendants argue the alleged unfair methods of competition and/or unfair or deceptive acts or practices fall outside the scope of the MCPA because none of the alleged misleading statements by PBM Defendants "occurred in the course of the sale, pricing, or promotion of the drugs at issue." (ECF No. 190-23 at 19.) The State responds that PBM Defendants' argument is waived because they failed to cite any legal authority in support. (ECF No. 190-23 at 28 (citing *Parvin v. CNA Fin. Corp.*, 646 F. App'x 562, 563 (9th Cir. 2016).) Regardless, the State further argues PBM Defendants' argument is meritless. (*Id*. at 28–29.)

The MCPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code. Ann. § 30-12-103. "Trade" and "commerce" are defined as "the advertising, offering for sale, sale, or distribution of any services, any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value, wherever

---

[16] The State specifically alleges "PBM Defendants conceal the fact that their formularies and the Manufacturer Payments they receive are aimed at raising the price of the at-issue drugs and, as a result, damage the health of diabetics." (*Id*.)

[17] The State alleges "PBM Defendants misrepresented that the false, inflated prices generated by the Insulin Pricing Scheme were the actual bona fide prices in order to make a deceptive comparison in representing the substantial 'savings' that the PBMs generated for Montana diabetics, payors and the Montana healthcare system." (*Id*.)

located, and includes any trade or commerce directly or indirectly affecting the people of this state." Mont. Code Ann. § 30-14-102(8). The statute is interpreted broadly and flexibly in scope "so as to effect its object and promote justice." *Walden v. D B & D, LLC*, Civ. A. No. , 2013 WL 322103, at *2 (D. Mont. Jan. 28, 2013) (citing *Baird*, 843 P.2d at 333).

As noted by the State, PBM Defendants do not cite any legal authority in support of their proposition that "generalized statements made by the PBMs in annual reports to their investors and during Congressional testimony" were "not [made] in the conduct of selling or promoting any at-issue drug." (ECF No. 190-12 at 19; ECF No. 190-23 at 28.) Given the emphasis on the broad interpretation of the MCPA, at this time, the Court is not convinced that PBM Defendants' statements made during Congressional testimony do not fall under the purview of "trade" and "commerce," as defined by the MCPA. *See* Mont. Code Ann. § 30-14-102; *see Walden*, 2013 WL 322103, at *2 ("Plaintiffs' allegations against Defendants also satisfy the trade and commerce requirements because Plaintiffs allege Defendants were unlawfully selling their cosmetology instruction services in a manner that directly affected Plaintiffs."); *Brookins v. Mote*, 292 P.3d 347, 360 (Mont. 2012) (holding "those acts or practices in the conduct of the entrepreneurial, commercial, or business aspects" of running defendant's business were actionable under the MCPA).

Therefore, PBM Defendants' Motion to Dismiss the State's claims under the MCPA is **DENIED**.

### D.  The State's Sufficiently Alleges its Unjust Enrichment Claim

#### 1.    The State's Allegations of Express Contracts

PBM Defendants assert the State fails to state a claim for unjust enrichment because it fails to establish that it lacks an adequate legal remedy. (ECF No. 190-12 at 20–21.) The State argues

any of PBM Defendants' contracts with either manufacturers, pharmacies, or payors are irrelevant "because those contracts do not exist between the unjust enrichment claimant (here, the State) and the unjust enrichment beneficiaries (here, the PBM[ Defendants])." (ECF No. 190-23 at 32.)

"Unjust enrichment is an equitable claim for restitution to prevent or remedy inequitable gain by another." *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 594 (Mont. 2018). To prevail on a claim for unjust enrichment, the aggrieved party must establish:

> (1) a benefit conferred on one party by another; (2) the other's appreciation or knowledge of the benefit; and (3) the other's acceptance or retention of the benefit under circumstances that would render it inequitable for the other to retain the benefit without compensating the first party for the value of the benefit.

*Id*. at 595. "A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." *Beck v. Dimar*, 554 P.3d 130, 138 (Mont. 2024) (quoting *Ruff*, 424 P.3d at 170). "Consequently, unjust enrichment applies in the contract context only when a party renders a valuable performance or confers a benefit upon another under a contract that is invalid, voidable, or otherwise ineffective to regulate the parties' obligations." *Id*. (quoting *Ruff*, 424 P.3d at 170). "Unjust enrichment does not necessarily require demonstrating misconduct or bad faith on behalf of the recipient." *Mont. Digit., LLC v. Trinity Lutheran Church*, 473 P.3d 1009, 1012 (Mont. 2020).

Generally, unjust enrichment is available when an adequate legal remedy does not exist. *N. Cheyenne Tribe v. Roman Catholic Church ex rel. Dioceses of Great Falls/Billings*, 296 P.3d 450, 457–58 (Mont. 2013) ("[A] claim for unjust enrichment . . . should be limited to situations in which no other remedy exists."); *see also Mountain Water Co. v. Mont. Dep't of Revenue*, 469 P.3d 136, 143 (Mont. 2020) (noting that unjust enrichment is "often available to ameliorate the harsh effects of law and to provide a remedy where a legal remedy is non-existent or inadequate"). Said another way, "unjust enrichment creates an obligation only 'in the absence of an agreement

23

between the parties.'" *Exxon Mobil Corp. v. AECOM Energy & Constr., Inc.*, Civ. A. No. 19-00107, 2024 WL 646097, at \*19 (D. Mont. Jan. 31, 2024) (quoting *Welu v. Twin Hearts Smiling Horses, Inc.*, 386 P.3d 937, 951 (Mont. 2016)). "In the absence of a contract between parties, the doctrine of unjust enrichment may create an implied contract in law." *Owen v. Skramovsky*, 313 P.3d 205, 209 (Mont. 2013) (citing *Hinebauch v. McRae*, 264 P.3d 1098, 1103–04 (Mont. 2011)).

As PBM Defendants recognize, the State alleges "[t]here is no express contract governing the dispute at-issue." (ECF No. 190-12 at 21 (quoting 190-29 ¶ 532).) PBM Defendants do not argue that there is any express contract between Plaintiff and PBM Defendants. (*See generally id*. at 20–21.) Therefore, the Court may proceed with its analysis of the sufficiency of the State's unjust enrichment claim because there is no contract governing the State's claims with PBM Defendants.

## 2.    Claim for Unjust Enrichment and the State's *Parens Patriae* Capacity

PBM Defendants argue this Court should dismiss the State's unjust enrichment claim because such claim is "inconsistent" with the State's *parens patriae* capacity. (ECF No. 190-12 at 21–22.) PBM Defendants assert "[c]ourts in other jurisdictions have expressed skepticism at the notion of *parens patriae* standing for unjust enrichment claims." (*Id*. at 22.) In support of their argument, PBM Defendants cite to three non-binding cases. (*Id*. (citing *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 478–79 (D.P.R. 2020); *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1079, 1098–1104 (S.D. Cal. 2018); *In re Auto. Parts Antitrust Litig.*, 2021 U.S. Dist. LEXIS 8201, at \*4–9 (E.D. Mich. Jan. 15, 2021)).) The State responds that none of these cases support PBM Defendants' argument and distinguishes each case. (ECF No. 190-23 at 32–33.) The State further contends the MCPA specifically grants this statutory power to the Montana Attorney General. (*Id*. at 33.)

To assert *parens patriae*[18] standing, a State must "meet both the basic requirements of Article III standing and the unique requirements of that doctrine." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017) (citing *Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001)). "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). In a *parens patriae* case, the State must additionally: (1) "articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party"; and (2) "express a quasi-sovereign interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 692, 607 (1982).

The Court finds PBM Defendants' arguments concerning the State's *parens patriae* standing unpersuasive. As other courts in the 9th Circuit have found, "[f]raming *parens patriae* as a Fed. R. Civ. P. 12(b)(6) issue lacks support at law." *Geo Grp., Inc.*, 283 F. Supp. 3d at 980. In *Geo Grp., Inc.*, the court analyzed case law submitted by defendant in its challenge to plaintiff's *parens patriae* authority under Fed. R. Civ. P. 12(b)(6). *Id*. The court closely examined the case law relied on by defendant, but found the "language used in the courts' analysis does not suggest that either court intended to analyze *parens patriae* under Fed. R. Civ. P. 12(b)(6), but rather shows consideration of the pleadings' sufficiency as to standing." *Id*.

---

[18] To bring a claim for unjust enrichment *parens patriae*, the State must allege interests beyond the individual interest of the parties. *Washington v. Geo Grp., Inc.*, 283 F. Supp. 3d 967, 979 (W.D. Wash. 2017). In *Geo Grp., Inc*., the court sustained the State's unjust enrichment claim because "Plaintiff does not seek damages on behalf of itself, but rather bring this action *in parens patriae* for Washington residents and workers, including detainees, who conferred a benefit on Defendants by working at compensation below the State minimum wage." *Id*. at 981.

Here, the cases cited by PBM Defendants predominantly face the same issue. The court in *In re Packaged Seafood Products Antitrust Litigation* ultimately found plaintiff failed to meet its burden to demonstrate it had standing to bring an injunctive relief claim under federal antitrust laws because plaintiff did not allege *any* facts about *any* alleged harm to any portion of its population. 338 F. Supp. 3d 1079, 1096–7 (S.D. Cal. 2018). In *In re Automotive Parts Antitrust Litigation*, the court in fact assumed plaintiff had standing under *parens patriae* but dismissed plaintiff's unjust enrichment claim based on the merits. Civ. A. No. 20-02005, 2021 WL 148004, at *3–4 (E.D. Mich. Jan. 15, 2021). Lastly, in *Government of Puerto Rico v. Carpenter Co.*, the court relied on a provision of a Puerto Rican antitrust law, which provided a specific legal remedy, to dismiss plaintiff's unjust enrichment claims on the merits. 442 F. Supp. 3d 464, 476–78 (D.P.R. 2020).

As such, this Court finds PBM Defendants' arguments unavailing, and the Motion to Dismiss the State's unjust enrichment claim is **DENIED**.

### E.  The State Plausibly Alleges a Civil Conspiracy Involving the PBMs

PBM Defendants contend this Court should dismiss the State's civil conspiracy claims for two reasons: (1) the State has failed to establish an underlying unlawful act, and (2) the State has not plausibly alleged a "meeting of the minds" among PBM Defendants or between PBM Defendants and Manufacturer Defendants. (ECF No. 190-12 at 23–25; ECF No. 190-52 at 13–14.) The State argues that it has both established an underlying unlawful act and alleged the existence of a conspiratorial agreement. (ECF No. 190-23 at 34–35; ECF No. 190-54 at 10–11.)

"A valid civil conspiracy claim requires that each of the following elements be established: '(1) two or more persons . . . ; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate

result thereof.'" *Sullivan v. Cherewick*, 391 P.3d 62, 68 (Mont. 2017) (alteration in original) (quoting *Schumacker v. Meridian Oil Co.*, 956 P.2d 1370, 1373 (Mont. 1998)). "To sustain a civil conspiracy action, a plaintiff must allege a tort committed by one of the alleged conspirators." *Hughes v. Pullman*, 36 P.3d 339, 343–44 (Mont. 2001) (citing *Duffy v. Butte Teachers' Union*, 541 P.2d 1199, 1202 (Mont. 1975)). When the underlying tort has been dismissed and "there is no underlying tort action forming a basis for civil conspiracy," the civil conspiracy claim must be dismissed. *Id.* at 344.

As discussed above, Counts One and Two survive PBM Defendants' challenge because they were pled with sufficient particularity, and therefore, the State has established the requisite underlying wrong. *Cf. id.* Moreover, this Court finds that the State has sufficiently alleged a "meeting of the minds" as asserted in the First Amended Complaint. (*See* Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 11–12 ("Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that PBM Defendants wield enormous control over drug prices and drug purchasing behavior in Montana. The unfair and deceptive scheme at the root of this Complaint—the Insulin Pricing Scheme—was born from this mutual understanding."); *id.* ¶ 20 ("Specifically, the Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, Manufacturer Defendants artificially and willingly raise their list prices, and then pay an undisclosed portion of that price back to the PBMs. These Manufacturer Payments[19] are provided under a variety of labels, yet, however they are described, these Manufacturer Payments, along

---

[19] The State defines "Manufacturer Payments" as "all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants . . . either directly via contract or indirectly via Manufacturer-controlled intermediaries." (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 20 n.3.)

with the inflated list prices, are quid pro quo for formulary inclusion on the PBMs' standard offerings."); *id*. ¶ 296 ("The PBM Defendants . . . set the prices in coordination with the Manufacturers[.]"); *id*. ¶ 320 ("PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at PBM trade associations and industry conferences.); *id*. ¶¶ 321–34 (alleging specific communications between Manufacturer Defendants and PBM Defendants at an annual conference). Accordingly, the State has sufficiently stated a claim for civil conspiracy, and PBM Defendants' Motion to Dismiss the State's civil conspiracy claim is **DENIED**.

### F.  The PBMs' Corporate Parents and Uninvolved Affiliates

PBM Defendants argue this Court should dismiss their corporate parents—Evernorth Health, Inc., CVS Pharmacy, Inc., OptumInsight, and UnitedHealth Group, Inc. (ECF No. 190-12 at 25–27.) The State counters that it has sufficiently stated claims against each of PBM Defendants' corporate parents based on their own conduct. (ECF No. 190-23 at 35–38.)

"[T]he doctrine of respondeat superior generally does not apply as between a parent and subsidiary corporation." *Timlick v. Liberty Mut. Ins. Co.*, Civ. A. No. 19-00099, 2020 WL 9778384, at *3 (D. Mont. Feb. 10, 2020) (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). "It is a general principle of corporate law . . . that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *Bestfoods*, 524 U.S. at 61.

The Court finds PBM Defendants' argument unavailing, as the State brought direct allegations against the PBMs' corporate parents based on their own conduct—not the conduct of the PBMs. (*See* Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 129–37 (asserting "[o]n a regular basis throughout the relevant time period, these Manufacturer executive teams—which at times include

the CEOs from these companies—met with Evernorth to discuss their coordinated efforts related to the at-issue drugs," and listing specific examples); ¶¶ 93–98 ("CVS Pharmacy, working in conjunction with its corporate affiliate entities, knowingly assisted the CVS Health family in profiting from the artificially inflated list prices produced by the Insulin Pricing Scheme by pocketing the spread between the acquisition cost for the drugs at issue . . . and the amounts received from payors[.]"); ¶¶ 189–96 ("Each Manufacturer Defendant had dedicated executives assigned to OptumInsight for the purpose of collaborating with key executives and coordinating with OptumInsight for data acquisition and utilization. . . . During the relevant time period, OptumInsight partnered with OptumRx to offer the at-issue pharmacy benefit and data and cost analysis services that gave rise to the Insulin Pricing Scheme to Montana diabetics and payors."); ¶¶ 180–88 ("UnitedHealth Group's Sustainability Report states that 'OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [UnitedHealth Group] then negotiate[s] with pharmacies to lower the costs at the point of sale . . . [UnitedHealth Group] also operate[s] [mail order pharmacies] . . . [UnitedHealth Group] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply.'" (alterations in original)).) As currently pleaded, the First Amended Complaint alleges sufficient facts to state a claim as to the parent corporations. *See* Fed. R. Civ. P. 12(b)(6). Therefore, PBM Defendants' Motion to Dismiss the State's claims against Defendants Evernorth Health, Inc., CVS Pharmacy, Inc., OptumInsight, and UnitedHealth Group, Inc. is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, PBM Defendants' Motion to Dismiss (ECF Nos. 190-11–12, 190-28, 190-52) pursuant to Federal Rule of Criminal Procedure 12(b)(6) is **DENIED**. An appropriate order follows.


**Date: September 5, 2025**                    _/s/ Brian R. Martinotti_
                                                **HON. BRIAN R. MARTINOTTI**
                                                **UNITED STATES DISTRICT JUDGE**