**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: INSULIN PRICING LITIGATION** | **Case No. 2:23-md-03080 (BRM)(LDW)** **MDL No. 3080** |
| **THIS DOCUMENT RELATES TO:** | **OPINION** |
| *The State of Montana, ex. rel. Austin Knudsen, Attorney General v. Eli Lilly and Company, et al.* | |
| Case No. 2:23-cv-04214 | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendants Eli Lilly and Company's ("Eli Lilly"), Sanofi-Aventis US LLC's ("Sanofi"), and Novo Nordisk Inc.'s ("Novo Nordisk") (together, the "Manufacturer Defendants") Motion to Dismiss[1] Plaintiff State of Montana's (the "State") First Amended

---

[1] Pursuant to Case Management Order #7—Order Governing Motions to Dismiss in the State Attorney General Track ("State AG Track") (ECF No. 141), the State AG Track cases were directed to refile all Fed. R. Civ. P. 12 motions and related exhibits, responses, and replies in the following State AG Track cases: *Illinois ex rel. Raoul v. Eli Lilly & Co. et al.*, No. 2:23-cv-04242 (the "Illinois Action"), and *Montana ex rel. Knudsen v. Eli Lilly & Co. et al.,* No. 2:23-cv-04214 (the "Montana Action"). Consequently, in addition to this Motion, the following motions were filed in connection with the Montana Action: (1) Evernorth Health, Inc. (ECF Nos. 190-13–14), CVS Health Corporation (ECF Nos. 190-15–16), and UnitedHealth Group Incorporated and OptumInsight, Inc.'s (ECF Nos. 190-17–18) motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and (2) PBM Defendants' (ECF Nos. 190-11–12) motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The following motions are pending in the Illinois Action: motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) by Evernorth Health, Inc. (ECF No. 190-31), UnitedHealth Group Incorporated and OptumInsight, Inc. (ECF No. 190-35), and CVS Health Corporation (ECF No. 190-33), and motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) by Manufacturer Defendants (ECF No. 190-37) and PBM Defendants (ECF No. 190-39). This Opinion only resolves Manufacturer Defendants' Motion to Dismiss pursuant to Rule 12(b)(2). (ECF Nos. 190-

Complaint (Dkt. No. 2:23-cv-04214, ECF No. 40)[2] pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF Nos. 190-1–10). The State filed an Opposition to Manufacturer Defendants' Motion to Dismiss (ECF No. 190-22), and Manufacturer Defendants filed their Reply (ECF No. 190-27). The parties additionally filed supplemental briefings. (ECF Nos. 190-51, 190-53.) Having reviewed and considered the submissions filed in connection with the Motion, for the reasons set forth below and for good cause having been shown, Manufacturer Defendants' Motion to Dismiss is **DENIED**.

## I.    BACKGROUND

### A.  Factual Background[3]

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the First Amended Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987).[4] "In ruling on a motion to dismiss under Federal

---

1–10.) The other motions filed pursuant to Case Management Order #7 will be addressed separately.

[2] At the direction of the Court, pursuant to Case Management Order #7, the motion and briefs were refiled on the master docket at ECF Nos. 190-1–10, 190-27, 190-51. *See supra* n.1. The Court will use the citations on the master docket unless otherwise indicated.

[3] The Court assumes the parties' familiarity with the factual and procedural history of this matter and therefore only includes the facts and procedural history necessary to decide this Motion.

[4] Because the parties originally removed the case to the District of Montana, and merely refiled their Motion to Dismiss papers on the master docket (*see* ECF No. 141), the parties use Ninth Circuit law in their arguments. Accordingly, the Court analyzes the parties' arguments pursuant to Ninth Circuit law. *See In re Johnson & Johnson Talcum Powder Prods. Mktg, Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it would have been subject in the transferor court." (quoting *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020))).

Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, a court may similarly consider 'uncontroverted allegations in the complaint.'" *Lindstrom v. Polaris Inc.*, Civ. A. No. 23-00137, 2024 WL 4237732, at *1 (D. Mont. Aug. 9, 2024) (quoting *Nationwide Agribusiness Ins. Co. v. Buhler Barth GmbH*, Civ. A. No. 15-00582, 2015 WL 6689572, at *3 (E.D. Cal. Oct. 30, 2015)).

This action arises out of the State's challenge to Manufacturer Defendants' allegedly unfair and unconscionable pricing scheme for their insulin medications. (*See generally* First Am. Compl. (Dkt. No. 2:23-cv-04214, ECF No. 40).) The sole plaintiff in this action is the State, brought in its name on relation of the Honorable Austin Knudsen, Attorney General of the State of Montana, pursuant to the Montana Unfair Trade Practices and Consumer Protection Act. Mont. Code Ann. § 30-14-101, *et seq.* ("MCPA").

Manufacturer Defendants Eli Lilly, Sanofi, and Novo Nordisk are healthcare and pharmaceutical manufacturers that sell prescription medications, including insulin products. (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 41–83.) Manufacturer Defendants set the list price for their prescription drugs, including insulin, which is known as the Wholesale Acquisition Cost ("WAC"). (*Id.* ¶¶ 285–87.) WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price[.]" 42 U.S.C. § 1395w-3a(c)(6)(B). The WAC serves as the reference point from which pharmacy benefit managers ("PBMs") and drug manufacturers negotiate rebates. (*Id.* ¶¶ 295–303.) The WAC differs from, but is related to, the Average Wholesale Price ("AWP"), which refers to the "average price that wholesalers charge[] to providers like doctors and pharmacies."[5] *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 87 (D. Mass.

---

[5] "Typically, AWP was a twenty percent markup over WAC." *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. at 87. "[M]ost manufacturers continued to report AWPs

2008). Pharmaceutical manufacturers self-report the WAC to publishing compendiums such as First Databank, Redbook, and others. (*Id*. ¶ 287.)

Branded prescription drugs in the United States move through a complex distribution chain where pharmaceutical manufacturers typically sell their products to wholesalers at a negotiated price. (*Id*. ¶ 286.) Wholesalers then supply the medications to various providers such as pharmacies, hospitals, and clinics, who then distribute the pharmaceuticals to patients with prescriptions. (*Id*. ¶¶ 283–86.) Uninsured consumers ultimately pay the full price for medication, whereas insured consumers pay for a portion of a drug's price through out-of-pocket costs such as deductibles, copayments, or coinsurance. (*Id*. ¶¶ 290–91.) Upstream payments to the manufacturers include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates. (*Id*. ¶ 20 n.3.)

The industry is unique because the way patients pay for prescription drugs vastly differs from the way wholesalers, PBMs, and health insurers pay for those same products. (*Id*. ¶ 285.) The prices for the products in the distribution chain differ for each participating entity—"different actors pay different prices set by different entities for the same drugs." (*Id*.) Manufacturers do not sell medications directly to the consumers and therefore do not set the consumer price for any particular medication; however, they do set the list price (WAC), and consumers usually pay for prescription drugs based on the manufacturer's list price. (*Id*. ¶ 286.)

---

consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were not actually charging these prices to providers and thus that the AWP relied on by Medicare and the [third-party payors] was not a true average price charged by wholesalers." *Id*.

Health insurers cover all or a portion of their insured customers' medications costs, submit payments to pharmacies on behalf of their members, and receive a reimbursement amount depending on whether and where the medication falls on their PBMs' formularies—the ranked list of approved drugs an insurance plan will cover. (*Id.* ¶ 7.) When insured patients purchase a prescription medication from a pharmacy, both the patient and their insurer pay a portion of the purchase price based on the price negotiated by the PBMs. (*Id.* ¶ 300–04.) Manufacturers understand that the PBM's formularies drive drug utilization: "if Manufacturers want their drugs to be prescribed and paid for, they must obtain preferrable formulary position on the PBM Defendants' formularies." (*Id.* ¶ 10.) Drug manufacturers may offer rebates to an insurer's PBM to gain formulary access for their prescription drugs. (*Id.* ¶¶ 20 n.3, 22, 345.) PBMs determine whether to pass along rebates to the health insurer, who in turn decide whether to share these cost-saving measures with consumers. (*Id.* ¶¶ 24–26.)

Here, the State alleges Manufacturer Defendants engaged in an unfair and unconscionable pricing scheme by artificially inflating the list prices for their insulin analog products so they could offer rebates as a "secret Manufacturer Payment[]" to certain PBMs in exchange for preferred formulary placement, which the State contends caused it and its constituents to overpay for Manufacturer Defendants' insulin products. (*Id.* ¶¶ 380–402.) The State maintains Manufacturer Defendants artificially inflated the list prices for their insulin products to compete for preferred positions on the PBMs' drug formularies by offering increased rebates to PBMs. (*Id.* ¶¶ 403–08.) The State further alleges that PBMs use their own mail-order and retail pharmacies to get customers to pay these artificially inflated prices for insulin products, resulting in higher profits

for PBMs. (*Id*. ¶¶ 409–20.) The State asserts that "Montana diabetics and payors[6], including the State, relied on the artificially inflated list prices by purchasing diabetic medications at such prices." (*Id*. ¶ 422.) The State attributes this pricing scheme to Manufacturer Defendants' "list prices for the at-issue drugs [becoming] detached completely from actual prices," resulting in the "list prices bec[oming] increasingly misrepresentative to the point of becoming unlawful." (*Id*. ¶ 425.)

According to the State, Manufacturer Defendants allegedly engaged in an unfair and unconscionable scheme of competing for formulary access of the largest PBMs by unjustifiably raising the list prices for the insulin analog products so they could offer the middlemen-PBMs bloated rebates—so-called "spreads" between list prices and net prices. (*Id*. ¶¶ 405–07.) "Net Prices" refers to the prices PBMs negotiate and pay for Manufacturer Defendants' products after subtracting from the list prices the rebate amounts Manufacturer Defendants issued to them in order to gain formulary placement. (*Id*. ¶¶ 344, 349.) Net prices may fluctuate as they necessarily depend on a particular PBM's negotiations with Manufacturer Defendants. (*Id*. ¶ 303.) The State contends Montana diabetics and payors, including the State, suffered monetary losses from overpaying for their insulin products because of Manufacturer Defendants' allegedly unfair and unconscionable pricing scheme. (*Id*. ¶ 470.)

The State claims PBM rebates are part of an industry scheme to inflate the price of insulin products, whereby the largest PBMs use their leverage to set formularies and increase profits. (*Id*. ¶¶ 316, 336, 536.) If a drug is excluded from the formularies, consumers may be required to pay a

---

6 The Court uses "payor" and "payer" interchangeably, as the parties' briefs, submissions, and proposed orders use both terms.

larger share of the cost, or even the full cost; accordingly, using formularies gives PBMs wide latitude to extract rebates from manufacturers. (*Id*. ¶¶ 314, 383–85.) The State argues Manufacturer Defendants offer PBMs higher spreads in exchange for preferred positions on their drug formularies, rather than lower their list prices for their prescription drugs. (*Id*. ¶¶ 403–05.) The State contends Manufacturer Defendants "artificially and willingly raise their list prices, and then pay an undisclosed portion of that price back to the PBMs," resulting in the State and diabetic Montana residents being "overcharged millions of dollars a year," which "directly and proximately caused injuries to consumers in the State of Montana." (*Id*. ¶¶ 20, 28–29, 520.)

### B. Procedural History

On September 29, 2022, the State, through Attorney General Austin Knudsen, filed a Complaint in the Montana First Judicial District Court, Lewis and Clark County. (Compl., Dkt. No. 2:23-cv-04214, ECF No. 12.) The matter was removed to the United States District Court for the District of Montana, Helena Division, on November 14, 2022. (Notice of Removal, Dkt. No. 2:23-cv-04214, ECF No. 1.) A supplemental notice of removal was filed on November 15, 2022. (Suppl. Notice of Removal, Dkt. No. 2:23-cv-04214, ECF No. 2.) The State filed its First Amended Complaint on January 9, 2023. (First Am. Compl., Dkt. No. 2:23-cv-04214, ECF No. 40.) The First Amended Complaint brings claims against Manufacturer Defendants for violation of the MCPA, Mont. Code Ann. § 30-14-101, *et seq*. (Count I), unjust enrichment (Count II), and civil conspiracy (Count III). (*See generally* Dkt. No. 2:23-cv-04214, ECF No. 40.)

On February 23, 2023, Manufacturer Defendants filed their joint Motion to Dismiss the State's First Amended Complaint. (Dkt. No. 2:23-cv-04214, ECF Nos. 84, 85, 88.) The State filed its Opposition on March 31, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 112.) Manufacturer Defendants filed their Reply in support of their Motion on April 28, 2023. (Dkt. No. 2:23-cv-

04214, ECF No. 130.) The court heard oral argument on the Motion on May 15, 2023. (Dkt. No. 2:23-cv-04214, ECF No. 150.)

On May 9, 2023, prior to the District of Montana hearing oral argument on the pending Motion to Dismiss, the State, along with movants the States of Arkansas, Illinois, Kansas, and Mississippi, filed notice of their motion for transfer of actions before the Judicial Panel on Multidistrict Litigation ("JPML") pursuant to 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings. (Dkt. No. 2:23-cv-04214, ECF No. 136.) On August 7, 2023, the JPML issued a Transfer Order, transferring this matter to this Court in the District of New Jersey. (Dkt. No. 2:23-cv-04214, ECF No. 160.) Pursuant to Case Management Order No. 7 (ECF No. 141), the parties re-filed their respective briefings on May 31, 2024 (ECF Nos. 190-1–10, 190-22, 190-27, 190-51, 190-53).

## II.    LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs a motion to dismiss for failure to state a claim upon which relief can be granted. "A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (citing *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)). The Court's standard of review is informed by Federal Rule of Civil Procedure 8(a)(2), which requires the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plausibility determination is context-specific and requires the Court to draw on judicial experience and common sense when evaluating a complaint. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). "[I]n practice, a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562 (second alteration in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

A court considering a Rule 12(b)(6) motion must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *Wyler Summit P'Ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1988). But "'bare assertions . . . amount[ing] to nothing more than a "formulaic recitation of the elements"' . . . for the purposes of ruling on a motion to dismiss, are not entitled to an assumption of truth." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (first two alterations in original) (quoting *Twombly*, 550 U.S. at 555). Such assertions "do nothing more than state a legal conclusion—even if that conclusion is cast in the form of a factual allegations." *Id.*

### B. Federal Rule of Civil Procedure 9(b)

Claims sounding in fraud or mistake are subject to the heightened pleading standard in Federal Rule of Civil Procedure 9(b). When fraud is alleged, Rule 9(b) requires the party state "with particularity the circumstances constituting the fraud." Rule 9(b) "demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the

particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). Application of Rule 9(b) is not dependent on whether fraud is an essential element of the claim asserted, rather, if the claim is "grounded in fraud" or "sound[s] in fraud," the particularity requirement of Rule 9(b) must be met. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).

To satisfy the requirements of Rule 9(b), the plaintiff must state the "who, what, when, where, and how of the misconduct charged." *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228 (9th Cir. 2019); *Vess*, 317 F.3d at 1106. "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106. The particularity requirement is governed by federal law, but a federal court "will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action . . . ." *Id*. at 1103.

### III.    DECISION

#### A.  Statute of Limitations

Manufacturer Defendants contend the State's claims are all time-barred because all three claims accrued before September 2019 and therefore fall outside the relevant limitations' periods. (ECF Nos. 190-1 at 11, 190-51 at 13–14.) The parties agree that the Montana statutes of limitation applicable to its claims for unfair or deceptive trade practices and unjust enrichment are two and three years, respectively. (ECF Nos. 190-1 at 11–12, 190-22 at 33.) *See also* Mont. Code Ann.

§ 27-2-211(1)(c)[7]; Mont. Code Ann. § 27-2-202(3).[8] However, the State maintains that its causes of action are saved by the following tolling doctrines: the discovery rule, fraudulent concealment, and the continuing tort doctrine. (ECF No. 190-22 at 35–41.) The State further asserts, regardless of the tolling doctrine, the statute of limitations period has not expired for acts that occur within the statutory period of limitation.

However, the parties' respective arguments are moot. After the parties filed all of their papers pertaining to this Motion, this Court, recognizing the statute of limitations issue encompassed all Plaintiffs across all tracks in the *In re Insulin Pricing Litigation* (Dkt. No. 2:23-md-3080), accepted supplemental briefing from all parties and heard oral argument regarding the issue of constructive notice. (*See* ECF Nos. 533–38; 563–65; 568, 569; 643, 666, 667.) As determined by this Court, the date of constructive notice for all Plaintiffs is January 14, 2021. (*See* ECF Nos. 706–07.) Because the State filed within two years of this date (September 29, 2022 (*see* Dkt. No. 2:23-cv-04214, ECF No. 12)), the State's claims are timely and not barred by any applicable statute of limitations.

---

[7] Although the MCPA has no statute of limitations of its own, actions to enforce a statutory liability other than a penalty or forfeiture or statutory debt created by the payment of public assistance must be brought within two years. Mont. Code Ann. § 27-2-211(1)(c); *see also Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435, 440–41 (Mont. 2003) (finding that "as a liability created by statute that is neither a penalty nor a statutory debt, claims brought under [the MCPA], . . . are subject to the two-year time limitation set forth" in Section 211).

[8] In the alternative, the State's MCPA claim is governed by Section 203, which applies to all "action[s] for relief on the ground of fraud or mistake" and requires actions be filed within two years of the "discovery by the aggrieved party of the facts constituting the fraud or mistake." Mont. Code Ann. § 27-2-203.

### B.  MCPA

### 1. Failure to State a Claim

The State invokes the MCPA, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103. The MCPA defines "consumer" as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes." *Id*. at § 30-14-102(1). Any consumer who sustains a loss as a result of this unlawful conduct may pursue a cause of action for relief. *Id*. at § 30-14-133. Further, the MCPA grants specific statutory authority for enforcement actions by the Montana Department of Justice in the name of the State of Montana.[9]

"An unfair act or practice is 'one which offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Doherty v. Fed. Nat'l Mortg. Ass'n*, 319 P.3d 1279, 1283 (Mont. 2014) (quoting *Rohrer v. Knudson*, 203 P.3d 759, 764 (Mont. 2009)). The Montana legislature enacted these provisions "to protect the public from unfair or deceptive practices." *Tripp v. Jeld-Wen, Inc.*, 112 P.3d 1018, 1026 (Mont. 2005); *see also* Mont. Code Ann. § 30-14-201. The Montana Supreme Court has stated that statutes like the MCPA have been interpreted as "broad in scope and flexible in application so as to respond to human inventiveness." *Baird v. Norwest Bank*, 843 P.2d 327, 333 (Mont. 1992) (citing *In re Smith*, 866 F.2d 576 (3d Cir. 1989)). Accordingly, the MCPA "should be liberally construed with a view to effect its object and to promote justice." *Id*.

---

[9] "Whenever the department has reason to believe that a person is using, has used, or is about to knowingly use any method, act, or practice declared by 30-14-103 to be unlawful and that proceeding would be in the public interest, the department may bring an action in the name of the state against the person to restrain by temporary or permanent injunction or temporary restraining order the use of the unlawful method, act, or practice upon giving appropriate notice to that person." Mont. Code Ann. § 30-14-111(1).

Manufacturer Defendants argue the State fails to plausibly allege any deceptive act or unfair trade practice for two reasons: (1) the State fails to allege any practice "contrary to established public policy," and (2) the State fails to adequately allege Manufacturer Defendants were "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." (ECF No. 190-1, at 28–31 (quoting *Young v. Era Advantage Realty*, 513 P.3d 505, 513 (Mont. 2022)).) The State contends Manufacturer Defendants' alleged scheme constitutes a claim for legally cognizable unfair or deceptive conduct under the MCPA. (ECF No. 190-22 at 13–17.)

An "unfair" act or practice under the law "offends established public policy" and causes serious injury. *Morrow v. Bank of Am., N.A.*, 324 P.3d 1167, 1184 (Mont. 2014) (quoting *Rohrer*, 203 P.3d at 764). The MCPA reaches "more broadly" than mere deception and includes "practice[s] contrary to 'established public policy.'" *Anderson v. ReconTrust Co., N.A.*, 407 P.3d 692, 700 (Mont. 2017) (citation omitted). While the MCPA does not further define unfair or deceptive acts, Montana courts "give due consideration and weight to interpretations of the [Federal Trade Commission ("FTC")] and federal courts regarding § 5(a)(1) of the FTC Act,[10] as required by [Mont. Code. Ann.] § 30-14-104(1)." *Rohrer*, 203 P.3d at 764. "Examples of unlawful acts or practices in the conduct of trade or commerce are listed in a Montana regulation, which also references interpretations of the FTC and federal courts regarding § 5(a)(1) of the FTC Act," referring to Mont. Admin. R. 23.19.101. *Id*. at 763.

The State contends, and the Court agrees, that Manufacturer Defendants' alleged actions fall within the scope of unlawful acts or practices as listed in Montana Regulations. (ECF No. 190-22, at 13–14.) As the State points out, the Regulation declares that:

---

[10] FTC Act is the Federal Trade Commission Act. 15 U.S.C. §§ 41–58.

A person engages in unfair or deceptive and therefore unlawful acts or practices when, in the conduct of any trade or commerce, he:

. . .

(e) makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of merchandise, or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

. . .

(k) makes false and misleading statements of fact concerning the price of merchandise or the reason for existence of, or amounts of a price reduction;

(l) states that a transaction involves rights, remedies or obligations that it does not involve; or

. . .

(p) employs deceptive pricing practices.

Mont. Admin. R. 23.19.101(1). The State's First Amended Complaint alleges that Manufacturer "Defendant[s'] effort[s] to conceal [their] pricing structures for the at-issue drugs [are] evidence that each [Manufacturer] Defendant knows its conduct is unfair and deceptive. (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶ 462.) The State further alleges:

> [T]he entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers' misrepresentations related to the reason behind the price, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is unfair and deceptive.

(*Id*. ¶ 464.) Moreover, and specifically as to the MCPA, the State alleges that Manufacturer Defendants engaged in deceptive and unfair practices by (1) "[k]nowingly making false representations as to the characteristics and benefits of goods and services," (2) "[c]oncealing, suppressing, and omitting material facts with the intent that others rely on the concealment,

14

suppression, and omission while selling any goods or services," and (3) "[r]epresenting that a specific price advantage exist[ed], when it did not." (*Id.* ¶ 513.) Accordingly, Manufacturer Defendants' alleged actions fall within the scope of unlawful acts or practices as listed in Montana Regulations.

Furthermore, the State's allegations sufficiently satisfy Rule 9(b)'s heightened pleading standard. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). To satisfy the specificity requirement of Rule 9(b), "the pleadings must state what the misrepresentation was, what was purchased, when the conduct complained of occurred, by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 104 (D.N.J. 2011) (quoting *Zebersky v. Bed Bath & Beyond, Inc.*, Civ. A. No. 06-01735, 2006 WL 3454993, at *4 (D.N.J. Nov. 29, 2006)). Here, the First Amended Complaint alleges Manufacturer Defendants specifically made misrepresentations regarding artificially inflated list prices to further the alleged insulin pricing scheme and to induce reliance by payors and diabetics to purchase the at-issue drugs, including Humulin N, Humulin R, Humalog, Trulicity, Basaglar, Lantus, Toujeo, Apidra, Soliqua, Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic. (Dkt. No. 2:23-cv-04214, ECF No. 40 ¶¶ 6 n.1, 421–36.) Moreover, the First Amended Complaint alleges the State purchased the at-issue drugs from 2003 through the present (*id.* ¶¶ 38, 467–71), and Manufacturer Defendants' misrepresentations damaged the State by affecting the health of diabetics and causing increases in the price of healthcare (*id.* ¶¶ 472–77). *See In re Insulin Pricing Litig.*, Civ. A. No. 17-00699, 2019 WL 643709, at *14 (D.N.J. Feb. 15, 2019) (finding plaintiffs' consumer fraud claims survived Rule 9(b)'s heightened pleading standard where the

complaint alleged misrepresentation in that defendants warranted the artificially inflated publicly reported benchmark prices of the at-issue drugs were the reasonable approximations of true cost).

To the extent Manufacturer Defendants argue the State cannot claim they "misled reasonably customers by reporting WAC prices accurately," (ECF No. 190-1, 23–24), this Court has previously rejected similar arguments. *See Insulin Pricing Litig.*, 2019 WL 643709, at *5 (finding plaintiffs adequately pled mail and wire fraud because they alleged "Defendants committed fraud by '[holding] out their artificially increased AWPs as benchmark prices, fully aware that AWP is a pricing index intended to approximate the true cost of a drug'" and that "the AWP had no reasonable relationship to the actual price of the drugs, and that Defendants knew of this fraud" (alteration in original)); *Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, Civ. Case No. 18-14999, 2020 WL 2394155, at *14 (D.N.J. Mar. 31, 2020) (declining to dismiss plaintiff's consumer protection claims despite defendants' contention that the Federal Medicaid Program's definition of WAC (42 U.S.C. § 1395w-3a(c)(6)(B)) dispelled the deceptiveness of pricing representations). Moreover, and as raised by the State, other courts have similarly rejected defendants' reliance on the definition of WAC contained in 42 U.S.C. § 1395w-3a(c)(6)(B)). (ECF No. 190-22 at 21; *City of Miami*, 2022 WL 198028 at *8 n.8 (finding manufacturer defendants could not rely on Section 1395w-3a(c)(6)(B)'s definition of WAC "to avoid the City's allegations of wrongdoing" that "[m]anufacturer [d]efendants inflated the price of insulin and other medications through the use of fraudulent rebates that served as kickbacks to the PBM Defendants").)

Though the unlawful practices and acts listed in Montana's Regulations are non-exhaustive, *see* Mont. Admin. R. 23.19.101(2), this Court finds Manufacturer Defendants'

alleged actions fall squarely under the enumerated list recognized as an unlawfully deceptive or unfair act or practice.

### a. The State's Unfairness Claims

### i. Price Inflation

Manufacturer Defendants assert that the State's unfairness claim under the MCPA "boil[s] down to a theory of price inflation" which "is not a 'cognizable theory of damages' for consumer protection claims under New Jersey or Delaware law."[11] (ECF No. 190-51 at 5–6 (citing *In re Insulin Pricing Litig.*, Civ. A. No. 17-00699, 2024 WL 416500, at *37–38 (D.N.J. Feb. 5, 2024).) Manufacturer Defendants contend the State cannot satisfy the requirement of an "ascertainable loss," as required under the MCPA, with a price inflation theory. (*Id.* at 6.) The State retorts that an ascertainable loss is not required under the MCPA in an action brought by the State. (ECF No. 190-53 at 9.)

Under the MCPA:

> [A] 'consumer who suffers any ascertainable loss of money or property' 'as a result of' another person's 'use or employment' of an 'unfair or deceptive act[] or practice[]' in the conduct of any trade or commerce' may 'recover money damages in the amount of any ascertainable loss of money or property or $500, whichever is greater.

*Kostelecky v. Peas in a Pod LLC*, 518 P.3d 840, 860 (Mont. 2022) (second and third alterations in original) (quoting Mont. Code. Ann. § 30-14-102(1), (8)(a), -103, and -133(1)(a)). "'[A]scertainable loss' includes any proven form of direct or indirect financial detriment or detrimental financial impact." *Id.* at 861. "Damages under the MCPA are to be broadly construed."

---

[11] As discussed *infra*, Manufacturer Defendants seek to impose on the State pleading requirements mandated in jurisdictions other than Montana.

*Guthridge v. Johnson & Johnson Corp.*, Civ. A. No. 22-00145, 2023 WL 6626175, at *3 (D. Mont. Sept. 22, 2023) (citing *Puryer v. HSBC Bank, USA, N.A.*, 419 P.3d 105, 114 (Mont. 2018)).

As the State points out, the MCPA authorizes the Montana Department of Justice to bring an action on behalf of its constituents. (ECF No. 190-53 at 9.) *See* Mont. Code Ann. § 30-14-111(1) ("Whenever the department has reason to believe that a person is using, has used, or is about to knowingly use any method, act, or practice declared by 30-14-103 to be unlawful and that proceeding would be in the public interest, the department may bring an action in the name of the state against the person to restrain by . . . temporary restraining order the use of the unlawful method, act, or practice upon giving appropriate notice to that person."). Manufacturer Defendants attempt to impose additional requirements based off case law from other jurisdictions to assert that the State cannot satisfy the requirements of "ascertainable loss" based on a price-inflation theory under the MCPA. (ECF No. 190-51 at 6–7 (citing *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007); *Wash. Cnty. Bd. of Educ. V. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698, 712–13 (D. Md. 2020)).) *Cf. ReconTrust Co.,* 407 P.3d at 700 ("A *private* MCPA claim also requires proof that the alleged unfair or deceptive trade act or practice caused the complaining consumer to suffer an 'ascertainable' financial or property 'loss.'" (emphasis added) (citing Mont. Code Ann. § 30-14-133(1)). The Court finds the case law cited by Manufacturer Defendants to be inapplicable, as the MCPA specifically carves out a cause of action for the Montana Department of Justice on behalf of the State of Montana to restrain against unlawful acts. *See* Mont. Code Ann. § 30-14-111.

### ii.  Price Gouging

Finally, Manufacturer Defendants assert the State's price gouging claims are not cognizable pursuant to the FTC Act. (ECF No. 190-51 at 7–10 (citation omitted).) Manufacturer

Defendants assert that the MCPA is modeled off the FTC Act, which "has never been applied to combat price gouging." (*Id*. at 7 (citation omitted).) Manufacturer Defendants further contend that allowing the State's price gouging claims to go forward would raise "serious due-process questions of notice and vagueness." (*Id*. at 10.) The State contends it is not raising any price gouging claims and that its consumer protection statute does not raise any due process concerns. (ECF No. 190-53 at 9–10.)

Pursuant to the MCPA, "*due consideration and weight* must be given to the interpretations of the federal trade commission and the federal courts relating to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C., 45(a)(1)), as amended." Mont. Code Ann. § 30-14-104(1) (emphasis added). The MCPA further states that the application of its rules "may not be inconsistent with the rules, regulations, and decisions of the federal trade commission and the federal courts in interpreting the provisions of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C., 45(a)(1)), as amended." Mont. Code Ann. § 30-14-104(2); *see also Montana v. O'Neil*, Civ. A. No. 07-00045, 2008 WL 11415913, at *1 (D. Mont. Feb. 19, 2008) ("The fact that Montana consumer protection law incorporates federal agencies' and federal courts' interpretations of federal consumer protection law does not mean that all Montana consumer protection law is completely preempted."). "Consistent with federal law and similar consumer protection acts of other states, [Montana courts] have construed § 30-14-103, MC[P]A, to more broadly define an unfair trade practice as a practice contrary to 'established public policy *and* which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *ReconTrust Co.*, 407 P.3d at 700 (quoting *Rohrer*, 203 P.3d at 204).

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C.A. § 45(a)(1). "An act or practice is deceptive if 'first, there is a

representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" *FTC v. Your Magazine Provider, Inc.*, Civ. A. No. 08-00064, 2009 WL 10677698, at *1 (D. Mont. Feb. 4, 2009) (quoting *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001)). "The primary purpose of the FTC Act is to protect the public from unfair or deceptive practices by those engaged in trade or commerce." *Plath v. Schonrock*, 64 P.3d 984, 989 (Mont. 2003) (citing *FTC v. Cinderella Career & Finishing Schs., Inc.*, 404 F.2d 1308, 1313 (D.C. Cir. 1968)).

As the State points out in its supplemental briefing, claims for price gouging do not appear in its First Amended Complaint. (*See generally* Dkt. No. 2:23-cv-04214, ECF No. 40.) The factual allegations raised in the First Amended Complaint extensively detail deceptive and unfair conduct by Manufacturer Defendants that is prohibited under the FTC Act. *See* 15 U.S.C.A. § 45(a)(1) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."). Accepting the State's allegations as true, the Court does not find that the State's claims cannot be consistently construed with the FTC Act. *See Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1042 (9th Cir. 2015) ("On a motion to dismiss, '[w]e accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party.'" (alteration in original) (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030 (9th Cir. 2008)).[12]

---

[12] Manufacturer Defendants also raise due process concerns. (*See* ECF No. 190-51 at 10 (expressing concerns of notice and vagueness).) This Court finds those concerns unfounded, as the MCPA "is interpreted broadly and flexibly so as to effect its object and promote justice." *Walden v. D B & D, LLC*, Civ. A. No. 12-00138, 2013 WL 322103, at *2 (D. Mont. 2013) (citing *Baird*, 843 P.2d at 333); *see also Kunda v. CBB Collections, Inc.*, Civ. A. No. 08-44, 2008 WL 11349863, at *2 (D. Mont. Aug. 15, 2008) ("The [MCPA] is broad in scope and should not be narrowly construed.").

### b.  Deception Claims

Manufacturer Defendants assert that the State's deception claims are preempted by federal law. (ECF No. 190-51 at 3–5); *see also* 42 U.S.C. § 1395w-3a(c)(6)(B) (defining WAC to mean "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price"). Manufacturer Defendants contend "any price-reporting obligations under state law that conflict with the definition of WAC under federal law are preempted." (ECF No. 190-1 at 3.) The State counters that Manufacturer Defendants oversimplify its contentions, and that the State's claims "do not seek to require the Manufacturer[ Defendants] to report their WACs in some other manner that would contradict Medicare's definition." (ECF No. 190-22 at 4–7 (internal citations, quotations, and brackets omitted).)

Federal law preempts state law when it is impossible to comply with both sets of laws. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963); *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) ("A conflict giving rise to preemption exists 'where it is impossible for a private party to comply with both state and federal law, . . . and where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (alteration in original) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000))). Impossibility preemption has been recognized as a "demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). "The 'existence of a hypothetical or potential conflict' is 'insufficient.'" *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 623 (9th Cir. 2024) (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982)). This means "the conflict must be an actual conflict, not merely a hypothetical or potential conflict." *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d

856, 863 (9th Cir. 2009). "Although this does not foreclose challenges based on future or anticipated conflicts, . . . the record must fairly support 'an irreconcilable conflict' between federal and state law." *Mont. Med. Ass'n*, 119 F.4th at 623 (quoting *Rice*, 458 U.S. at 659).

Pursuant to federal law under Medicare, manufacturers are required to report a single WAC for each product they sell quarterly. 42 U.S.C. § 1395w-3a(f)(1). Federal regulations define WAC as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, *not including prompt pay or other discounts, rebates or reductions in price*." *Id.* at (c)(6)(B) (emphasis added). Notably, federal regulations do not specify how to calculate list prices; list prices are determined by the manufacturer. *See generally* 42 U.S.C. § 1395, *et seq*.

Manufacturer Defendants presume the State seeks to have them report the WAC excluding rebates and other discounts. (ECF No. 190-1 at 3–5.) Therefore, Manufacturer Defendants argue that it is impossible to avoid liability under the State's claims while complying with federally required reporting requirements under Medicare. (*Id*.) The State contends Manufacturer Defendants mischaracterize its claims and asserts Manufacturer Defendants are still able to publish their respective WACs under Medicare while complying with the State's consumer protection statute. (ECF No. 190-22 at 4–7.)

Manufacturer Defendants cite to this Court's Opinion in *In re Insulin Pricing Litigation*, Civ. A. No. 2:17-cv-00699, to demonstrate preemption, noting that "this Court has already said it 'does not see' how it could require the Manufacturer Defendants to report WACs in some other manner 'without causing Defendants to violate federal law.'" (ECF No. 190-51 at 3 (citing 2024 WL 416500, at *28).) However, in this Opinion, which addressed a motion for class certification pursuant to Fed. Civ. R. 23, this Court noted that plaintiffs clarified "they are seeking to enjoin Defendants 'from continuing to report artificially inflated list prices that do not approximate their

true net prices to [PBMs].'" *In re Insulin Pricing Litig.*, 2024 WL 416500, at *26. Specifically, this Court noted it "does not see—and Plaintiffs do not explain—how it would be able to enjoin Defendants as Plaintiffs request without causing Defendants to violate federal law." *Id.* at *28.

Here, it is clear the State does not seek to enjoin Manufacturer Defendants from reporting WAC in accordance with federal Medicare regulations. (*See* ECF No. 190-53 at 5 ("To be certain, the State[']s[] claims do not seek to require the Manufacturers to report their WACs in some other manner that would contradict Medicare's definition[.]" (internal quotations, brackets, and citation omitted)).) The State suggests "Manufacturers could have made public their actual, net prices, *in addition to publishing WAC prices*." (*Id.* at 6.) Manufacturer Defendants have not identified any Medicare provision enjoining them from making additional disclosures in conjunction with quarterly reporting of the WAC. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 174–75 (1st Cir. 2009) (finding Massachusetts consumer protection statute neither conflicted with nor was preempted by Medicare Part B reimbursement rates, and therefore the state was not precluded from invoking the statute to find a drug manufacturer liable for seeking reimbursements which did not reflect the discounts and rebates in the reported average wholesale prices); *see also Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 724 F. Supp. 3d 1174, 1193 (D. Or. 2024) (finding it was possible to comply with both public-interest exception in Oregon law that imposed obligation on pharmaceutical manufacturers to report information about new prescription drugs and historical information about pricing did not interfere with the objectives of the Defend Trade Secrets Act).

While Manufacturer Defendants may at some later stage in this action demonstrate a sufficiently specific conflict to give rise to preemption, the Court finds that at this stage no such specific conflict has been demonstrated. Therefore, Manufacturer Defendants have not established that the State's claims are preempted.

### 2.    Dormant Commerce Clause

In their Supplemental Briefing, Manufacturer Defendants argue the State's consumer protection claims violate the Dormant Commerce Clause, which bars state or local regulations that would "unduly restrict interstate commerce." (ECF No. 190-51 at 10–13 (quoting *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019)).) Manufacturer Defendants first contend that use of a state consumer protection law to regulate Manufacturer Defendants' nationwide WACs would violate the Dormant Commerce Clause. (*Id.* at 11–12.) Even if the State's claims did not directly regulate out-of-state conduct, Manufacturer Defendants argue they would still violate the Dormant Commerce Clause because putative local benefits are outweighed by the burden the State's claims would have on interstate commerce. (*Id.* at 12–13.)

The Commerce Clause of the Constitution grants Congress authority to regulate interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3. The Commerce Clause prohibits states from discriminating against interstate regulations that, though facially nondiscriminatory, unduly burden state commerce—commonly referred to as the dormant Commerce Clause. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009). "The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987). Therefore, the overarching concern of the dormant Commerce Clause is that "this Nation is a common market in which state lines cannot be made barriers to the free flow of both raw materials and finished goods." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 803 (1976).

"[A] state regulation does not become vulnerable to invalidation under the dormant Commerce Clause merely because it affects interstate commerce." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012). To prove a violation of the dormant

Commerce Clause, there must be a substantial burden on interstate commerce. *Id*. (citing *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)). Most regulations run afoul of the dormant Commerce Clause because of discrimination, but courts have also invalidated statutes imposing other significant burdens on interstate commerce. *Id*. "These other significant burdens on interstate commerce generally result from inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Id*. (citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997); *CTS Corp.*, 481 U.S. at 88; *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 128 (1978)). However, the Supreme Court has recognized that "under our constitutional scheme the States retain 'broad power' to legislate protection for their citizens in matters of local concern such as public health" and that "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Great Atl. & Pac. Tea Co., Inc. v. Cottrell*, 424 U.S. 366, 371 (1976) (quoting *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 531–32 (1949)).

Manufacturer Defendants asks the Court to find that the State's claims' extraterritorial impact violates the underlying principles of the dormant Commerce Clause. (ECF No. 190-51 at 11–12.) According to Manufacturer Defendants, the State's claims would, in effect, regulate prices for all sales of products to wholesalers nationally. (*Id*. at 11.) The State retorts that its claims under the MCPA are nondiscriminatory, but that "[t]here is no per se rule forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State." (ECF No. 190-53 at 11.)

State laws that only regulate conduct, such as the sale of products, in the state do not have impermissible extraterritorial effects. *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1029 (9th Cir. 2021) (citing *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 445 (9th Cir. 2019)). "A

state law may require out-of-state producers to meet burdensome requirements in order to sell their products in the state without violating the dormant Commerce Clause." *Id*. (citing *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 952 (9th Cir. 2019); *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 942 (9th Cir. 2013)). "Even if a state's requirements have significant upstream effects outside of the state, and even if the burden of the law falls primarily on citizens of other states, the requirements do not impose *impermissible* extraterritorial effects." *Id*. A state law is impermissibly extraterritorial if its directly regulates conduct that is wholly out of state. *Rosenblatt*, 940 F.3d at 442.

Manufacturer Defendants rely on the court's decision in *Association for Accessible Medicines v. Frosh*, 887 F.3d 664 (4th Cir. 2018). (ECF No. 190-51 at 11–12.) At issue in this case was Maryland's Anti-Price Gouging Statute, which prohibited "'[a] manufacturer or wholesale distributor' from 'engag[ing] in price gouging in the sale of an essential off-patent or generic drug.'" *Frosh*, 887 F.3d at 666 (alterations in original) (quoting Md. Code Ann. § 2-802(a)). The statute defined "price gouging" as "an unconscionable increase in the price of a prescription drug." Md. Code Ann. § 2-801(c). The Fourth Circuit found the statute violated the dormant Commerce Clause. *Frosh*, 887 F.3d at 674. The parties agreed that nearly all transactions invoking the statute occurred outside of Maryland, and the structure of the statute made clear that it targeted upstream pricing and sale of prescription drugs, effectively compelling manufacturers and wholesalers outside of Maryland to comply with the statute. *Id*. at 671–72.

However, that Maryland statute is fundamentally different from Montana's consumer protection statute. Whereas the Maryland law expressly targeted upstream sales that took place wholly outside of Maryland and would have imposed liability for unconscionable price increases,

*id.* at 671–72, the MCPA does no such thing.[13] *See generally* Mont. Code Ann. § 30-14-101, *et seq*. Moreover, Manufacturer Defendants have not pointed to a single provision in the MCPA that purports to set a national price for their WACs. (*See* ECF No. 190-1 at 12 ("[T]he States cannot use their consumer-protection laws to regulate the Manufacturers' nationwide WACs.").) At this juncture, the Court cannot determine that the State's claims run afoul of the dormant Commerce Clause. And as the Fourth Circuit made clear, "we in no way mean to suggest that Maryland and other states cannot enact legislation meant to secure lower prescription drug prices for their citizens." *Frosh*, 887 F.3d at 674.

Alternatively, Manufacturer Defendants contend even if the State's claims did not directly regulate out-of-state conduct, they would still run afoul of the dormant Commerce Clause because "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." (ECF No. 190-51 at 12 (alteration in original) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).) To reconcile competing interests of local autonomy and burdens on interstate commerce, the Supreme Court has employed a balancing test, explained in *Pike*:

> Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest

---

[13] The court in *Ass'n for Accessible Meds. v. Ellison* followed the same logic as the *Frosh* court, finding the disputed regulation "directly regulate[d] upstream sales that t[ook] place wholly outside of Minnesota and impose[d] liability on those engaged in those sales, even though neither the sales nor the contracting parties ha[d] any connection to Minnesota." 704 F. Supp. 3d 947, 955 (D. Minn. 2023), *appeal filed*, 8th Cir., Jan. 3, 2024.

> involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

397 U.S. at 142 (internal citations omitted).

As the party challenging the regulation, Manufacturer Defendants must establish that the burdens imposed on interstate commerce by the MCPA clearly outweigh its local benefits. *See Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 399 (9th Cir. 1995). "[C]onclusory allegations of disparate impact are not sufficient," as the party challenging the regulation must assert "specific facts to support a plausible claim that the ordinance has a discriminatory effect on interstate commerce." *Rosenblatt*, 940 F.3d at 452 (quoting *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017)). "The mere fact that a firm engaged in interstate commerce will face increased costs as a result of complying with state regulations does not, on its own, suffice to establish a substantial burden on interstate commerce." *Ward v. United Airlines, Inc.*, 986 F.3d 1234, 1241–42 (9th Cir. 2021).

The central purpose of the MCPA "is to safeguard the public against the creation or perpetuation of monopolies and foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented." Mont. Code Ann. § 30-14-201. "[T]he public has a strong interest in supporting fair and honest competition[.]" *Jore Corp. v. Drillcraft Tools Corp.*, Civ. A. No. 12-00126, 2012 WL 3929952, at *5 (D. Mont. Sept. 10, 2012) (citing *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092–93 (E.D. Cal. Mar. 21, 2012)); *see also Tripp*, 112 P.3d at 1026 ("[T]he purpose of the MCPA . . . . is of a high legislative priority.").

Manufacturer Defendants contend that the burden the State seeks to impose—"determining the very prices the Manufacturers can set for their products nationwide"— outweighs any local benefits enacted by the MCPA. (ECF No. 190-51 at 12.) The State counters the MCPA does not

impose any facial price controls, but even if it did, any burdens that may arise from enforcement of the MCPA "are not clearly excessive and pale in comparison to the benefits." (ECF No. 190-53 at 13.) At the outset, the MCPA does not regulate any pharmaceutical prices. *See generally* Mont. Code Ann. § 30-14-201, *et seq*. Moreover, as the State maintains, it is not seeking to control the price of Manufacturer Defendants' WAC.

Given the State's and Manufacturer Defendants' conflicting contentions regarding the State's claims, this Court finds the dismissal of the State's claims based on dormant Commerce Clause concerns would be premature. "The fact-intensive character of" the *Pike* balancing test "counsels against a premature dismissal." *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 546 (4th Cir. 2013); *see also Selvaggi v. Borough of Point Pleasant Beach*, Civ. A. No. 22-00708, 2024 WL 303677, at *19 (D.N.J. Jan. 26, 2024) (finding plaintiffs' dormant Commerce Clause claim would benefit from further factual development and dismissal at the pleadings stage would be premature). Moreover, "conclusory allegations of disparate impact are not sufficient[.]" *Park Pet Shop,* 872 F.3d at 503. Like in *Selvaggi*, this Court finds that additional factual development is needed to sufficiently assess Manufacturer Defendants' dormant Commerce Clause argument. *See Stolfi*, 724 F. Supp. 3d at 1194–96 (declining to grant summary judgment on plaintiff's dormant Commerce Clause claim at that stage because the court could not determine the practical effect of Oregon statute, which required pharmaceutical manufacturers to report information about specific new prescription drugs and historical information about pricing for existing drugs, on interstate commerce); *accord Rosenblatt*, 940 F.3d at 452 (dismissing *Pike* claim where the "complaint fail[ed] to sufficiently allege that the ordinance's effect on interstate commerce clearly outweigh[ed] the ordinance's local benefits").

Accordingly, Manufacturer Defendants' Motion to Dismiss the State's MCPA claim is **DENIED**.

### C.  Unjust Enrichment

Manufacturer Defendants assert the State fails to state a claim for unjust enrichment for three reasons: (1) the State cannot seek an equitable remedy without pleading it lacks an adequate remedy at law; (2) the Court cannot imply a contract between the State and Manufacturer Defendants; and (3) Manufacturer Defendants have not retained any allegedly unjust benefit. (ECF No. 190-1 at 31–33.)

"Unjust enrichment is an equitable claim for restitution to prevent or remedy inequitable gain by another." *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 594 (Mont. 2018). To prevail on a claim for unjust enrichment, the aggrieved party must establish:

> (1) a benefit conferred on one party by another; (2) the other's appreciation or knowledge of the benefit; and (3) the other's acceptance or retention of the benefit under circumstances that would render it inequitable for the other to retain the benefit without compensating the first party for the value of the benefit.

*Id*. at 595. "A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment." *Beck v. Dimar*, 554 P.3d 130, 138 (Mont. 2024) (quoting *Ruff*, 424 P.3d at 170). "Consequently, unjust enrichment applies in the contract context only when a party renders a valuable performance or confers a benefit upon another under a contract that is invalid, voidable, or otherwise ineffective to regulate the parties' obligations." *Id*. (quoting *Ruff*, 424 P.3d at 170). "Unjust enrichment does not necessarily require demonstrating misconduct or bad faith on behalf of the recipient." *Mont. Digit., LLC v. Trinity Lutheran Church*, 473 P.3d 1009, 1012 (Mont. 2020).

Generally, unjust enrichment is available when an adequate legal remedy does not exist. *N. Cheyenne Tribe v. Roman Catholic Church ex rel. Dioceses of Great Falls/Billings*, 296 P.3d

450, 457–58 (Mont. 2013) ("[A] claim for unjust enrichment . . . should be limited to situations in which no other remedy exists."); *see also Mountain Water Co. v. Mont. Dep't of Revenue*, 469 P.3d 136, 143 (Mont. 2020) (noting that unjust enrichment is "often available to ameliorate the harsh effects of law and to provide a remedy where a legal remedy is non-existent or inadequate"). "In the absence of a contract between parties, the doctrine of unjust enrichment may create an implied contract in law." *Owen v. Skramovsky*, 313 P.3d 205, 209 (Mont. 2013) (citing *Hinebauch v. McRae*, 264 P.3d 1098, 1103–04 (Mont. 2011)).

Manufacturer Defendants argue the State's unjust enrichment claims must be dismissed in light of the State's contract with Defendant CVS Caremark. (ECF No. 190-1 at 32–33.) Manufacturer Defendants attempt to rely on a contract that it was not privy to in order to absolve it from unjust enrichment liability while simultaneously claiming a contract cannot be implied in this instance because Manufacturer Defendants are not in privity with the State. (*Id.*) Manufacturer Defendants cannot have it both ways. As Manufacturer Defendants point out in their moving papers, there is no contract between the State and Manufacturer Defendants, meaning the State's unjust enrichment claim may proceed. *See Beck*, 554 P.3d at 138; *see also Walden*, 2013 WL 322103, at *4 ("In sum, it appears that while an implied contract cannot exist absent unjust enrichment, an unjust enrichment claim can exist, at least in some circumstances, in the presence of a contract between the parties.").

Manufacturer Defendants further contend that the State's unjust enrichment claim fails because the State cannot seek an equitable remedy without pleading "that [it] lacks an adequate remedy at law." (ECF No. 190-1 at 31–32 (alteration in original) (quoting *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)).) Notably, the *Sonner* court observed that "the operative complaint does not allege that [the plaintiff] lacks an adequate legal remedy." 971 F.3d

at 844. However, Montana state courts have allowed simultaneous pleadings for a legal remedy under the MCPA and unjust enrichment. *See Walden*, 2013 WL 322103, at *4 ("Causes of action in Montana frequently contain breach of contract and unjust enrichment claims, and the Montana Supreme Court reaches the merits of both claims."); *Sides v. Glob. Travel All., Inc.*, Civ. A. No. 20-00053, 2021 WL 5926136, at *12 (D. Mont. Aug. 16, 2021) (declining to dismiss plaintiffs' unjust enrichment claim where plaintiffs stated claims for breach of contract and violation of the MCPA); *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668–69 (9th Cir. 2019) (reversing district court's dismissal with prejudice of state law claims including claims under the MCPA and unjust enrichment); *Paatalo v. J.P. Morgan Chase Bank, N.A.*, Civ. A. No. 10-119, 2011 WL 13130862, at *11 (D. Mont. May 18, 2011) (allowing plaintiff's MCPA and unjust enrichment claims to proceed and granting leave to amend).

Accordingly, Manufacturer Defendants' Motion to Dismiss the State's unjust enrichment claim is **DENIED**.

### D.  Civil Conspiracy

Manufacturer Defendants contend this Court should dismiss the State's claim for civil conspiracy (Count Three) as wholly derivative of the State's claims for violations of the MCPA (Count One) and unjust enrichment (Count Two), which should also be dismissed. (ECF No. 190-1 at 34–35.) The State maintains that it has "appropriately anchor[ed] its civil conspiracy claim on the underlying wrongs of artificially inflating and reporting false list prices, in violation of the MCPA and the doctrine of unjust enrichment." (ECF No. 190-22 at 27–33.)

"A valid civil conspiracy claim requires that each of the following elements be established: '(1) two or more persons . . . ; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate

result thereof.'" *Sullivan v. Cherewick*, 391 P.3d 62, 68 (Mont. 2017) (alteration in original) (quoting *Schumacker v. Meridian Oil Co.*, 956 P.2d 1370, 1373 (Mont. 1998)). "To sustain a civil conspiracy action, a plaintiff must allege a tort committed by one of the alleged conspirators." *Hughes v. Pullman*, 36 P.3d 339, 343–44 (Mont. 2001) (citing *Duffy v. Butte Teachers' Union*, 541 P.2d 1199, 1202 (Mont. 1975)). When the underlying tort has been dismissed and "there is no underlying tort action forming a basis for civil conspiracy," the civil conspiracy claim must be dismissed. *Id*. at 344.

However, as discussed above, Counts One and Two survive Manufacturer Defendants' challenge because they were pled with sufficient particularity. *See* Fed. R. Civ. P. 9(b). Accordingly, Manufacturer Defendants' Motion to Dismiss Count Three is **DENIED**.

### IV.    CONCLUSION

For the reasons set forth above, Manufacturer Defendants' Motion to Dismiss (ECF Nos. 190-1–10, 190-27, 190-51) pursuant to Federal Rule of Criminal Procedure 12(b)(6) is **DENIED**. An appropriate order follows.

**Dated: September 5, 2025**            */s/ Brian R. Martinotti*
                        **HON. BRIAN R. MARTINOTTI**
                        **UNITED STATES DISTRICT JUDGE**